## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF IDAHO

In re: | Case Number:  19-00138-JMM

Gordon Jones and Vicki L Jones | Chapter 11

Debtors | Hearing Date: TBD

**U.S. COURTS**

**JAN 3 0 2020**

Rcvd_____Filed____Time 3:22
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

### Debtors' Disclosure Statement

Gordon Jones and Vicki L Jones, Debtors and Debtors in Possession ("Debtor") in the above captioned case, provide herewith the information contained in this Disclosure Statement ("Disclosure Statement") to all known Creditors and other parties in interest of the Debtor, in order to disclose the information deemed material, important, and necessary for the Creditors to arrive at a reasonably informed decision in exercising their rights to vote for acceptance of the Debtor's Plan of Reorganization ("Plan").

Together with this Disclosure Statement, each Creditor should also have received a copy of Debtor's Plan of Reorganization, a form Ballot on which Creditors and other parties in interest who are entitled to vote, may cast their respective vote, and a copy of the Order Approving Debtor's Disclosure Statement which indicates that the Bankruptcy Court has approved this Disclosure Statement for circulation to Creditors, indicating that it contains information of a kind and of sufficient detail, as far as it is reasonably practicable, to enable creditors and other parties in interest to make an informed decision about the Plan. As indicated in the instructions accompanying the Ballot, which is the form on which you may cast your vote to accept or reject the Plan, the Ballot must be mailed to Debtor in time to insure that your Ballot will be received by the due date. Ballots received after the due date may not be counted.

You are urged to carefully read this Disclosure Statement and the Debtor's Plan of Reorganization before deciding to accept or reject the Plan. Particular attention should be directed to the provisions of the Plan affecting your rights as well as the Liquidation Analysis which describes the results which would be obtained in the event the Debtor's assets were to be liquidated in a Chapter 7 bankruptcy.

## The Chapter 11 Confirmation Process

The Chapter 11 confirmation process is governed, in large part, by the Bankruptcy Code. Under the Bankruptcy Code, to be confirmed (accepted), the Debtor's Plan of Reorganization must be accepted by at least one Class of Creditors whose claims against the Debtor will be "impaired" under the Plan. Creditors who are scheduled to receive full payment on their Claims are deemed to have accepted the Plan and do not vote. Only Creditors whose Claims are "impaired" are entitled to vote in favor of accepting or rejecting the Plan. A Class of claims is "impaired" if the amount to be paid to the Class provides the Creditors in that Class with less than full payment of the Allowed Claims in that Class or the terms for repayment are extended beyond the contractual due date. The Plan is accepted by such Class if at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class vote in favor of the Plan.

## Disclaimer

No representations concerning the debtor, its future business operations or value of property, are authorized by the debtor, other than as set forth in this statement. Any representations or inducements made to secure acceptance of the plan of reorganization which are not contained herein or in the plan of reorganization should not be relied on by any creditor or other party in interest. Although the financial information contained herein is believed to be accurate, it has not been subjected to any certified audit and is not warranted or represented to be error free.

## Debtor's Financial History and Events Leading to Chapter 11 Filing

The Debtor, Gordon Jones, has been a general contractor in the construction industry for over 40 years, managing and building a multitude of industrial, commercial and residential projects. In the late 1990's and early 2000's, the Debtor started getting more involved with real estate development then around the time of the 2008 economic recession, his construction business had slowed. Prior to the recession Debtor had purchased several properties, one of which was to be developed into a sand and gravel project in southeast Boise, Idaho. Debtor spent

the next couple of years developing that project along with another commercial development in Fruitland, Idaho. Unfortunately the 2008 recession caused both project to derail; the Fruitland property was partially developed, but has been sitting idle every since.

Around 2010, the Debtor had acquired a gold mining property near Helmville, Montana and started to work on developing that project over the next couple years. However, around the same time, things had become distressed with the sand and gravel property in Boise because he had borrowed a significant amount of money against the property and it eventually wound up in foreclosure.

By 2012, Debtor's construction business had significantly slowed and he was focused on trying to put together a mining operation on the Montana property. That same year, a colleague had introduced the Debtor to a man in Montana named Don Beck, who owns several large tracks of property in Gold Creek, Montana. Beck was leasing portions of his land on a mining lease to a company named Whitehorse; however Whitehorse was looking to get out of the lease. After checking out the property, the Debtor saw on opportunity and decided to purchase the lease from Whitehorse.

That year, the Debtor had been introduced to Knife River Corporation's regional president, Dave Turner, with whom the Debtor had several meetings to discuss possible mining projects. Eventually, the Debtor and Mr. Turner came to an agreement to conduct testing on the land the Debtor had acquired the lease for in Gold Creek, Montana. Late summer 2012, Knife River had sent equipment and a crew up to Gold Creek and testing was conducted over a 2 or 3 week period. After getting promising results from the testing program, the Debtor and Dave Turner began discussing prospects a full production operation. Over the next several months, after several meetings, the Debtor and Mr. Turner eventually came to agreement on a joint venture contract in April 2013 to conduct a full scare mining operation on the Gold Creek property.

The 2013 season, however, turned into a disaster and the Gold Creek project wound up failing horribly due to incompetency, numerous failures and several breaches of contract on the part of Knife River and the Debtor ended up losing in excess of $1M. The agreement for the joint venture was a 60/40 split of profits or loses with the Debtor having 60% and Knife River 40%. The total expenditures for the season were approximately $1.4M. At the time, the Debtor did not have enough cash to cover his 60% of loses, so later in 2014, the Debtor and Knife River worked

out a settlement agreement whereby the Debtor had convey a parcel of real property to Knife River for satisfaction of the Debtor's 60% portion of the Gold Creek project costs. However, almost a year after the settlement, in July, 2015, in direct breach of both the joint venture contract and the settlement contract, Knife River brought a frivolous, if not fraudulent lawsuit against the Debtor alleging the Debtor owed another $600-800K and that Knife River owed nothing.

Several months later, Beck Gold Creek Ranch, with whom the Debtor had the lease in Gold Creek, also brought forth a frivolous lawsuit against the Debtor, alleging that Beck was owed damages from "expected royalties", which was also in direct contradiction to the terms of the lease.

The Debtor spent the next 3 years in ligation on both suits, eventually running out of funds for the attorney who was handling both cases and the Debtor had to go pro se. Subsequently, the Debtor was virtually denied his day in court by the Powell County District Court in Montana. In 2018, the judge in Montana granted default judgments to both Knife River and Beck. However, no final orders where entered and the cases are still pending.

All the while, between 2010 and 2018, the Debtor had accumulated quite a large debt load. One of his Creditors, Richard Zamzow, had advanced the Debtor over $1M in loans that are secured by several properties in Ada County, Idaho. In October, 2018, Mr. Zamzow started foreclosure on the secured properties with the sales to take place in February 2019.

Due to the pressure from the the pending lawsuits, a very large debt load and an impending foreclosure sale on properties that the Debtor stood to lose a lot of equity in, the Debtor chose to file for Chapter 11 Reorganization, in order to get some breathing room to be able to sell some of his properties with significant equity in an effort to satisfy his debt obligations to his Creditors.

## Administrative Claims, Professional Fees and Priority Tax Claims

Certain types of Claims are not placed into voting Classes, instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has not placed the Claims described in this Article II in a Class.

A.) <u>Administrative Claims</u>

All costs and expenses of administration in this case, including any actual and necessary expenses of preserving or liquidating the assets of the Debtors' estate, all allowances, including Professional Fees and costs, approved by the Bankruptcy Court, and any other costs and expenses entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code and 28 U.S.C. § 1930, shall be paid in full on the Effective Date of the Plan. The Holders of these Claims include the attorneys, accountants or other Professionals of the Debtor, unpaid post-petition accounts payable (if any), and all fees to be paid to the US Trustee.

With respect to all Administrative Claims other than Professional Fee Claims not paid on the Effective Date, the Debtor shall pay each Holder of an Allowed Administrative Claim (except for Professional Fees to the extent that their treatment, which is set forth below, differs) in full in the amount of the Allowed Claim, without interest, in Cash within 60 days after the Claim becomes an Allowed Claim; provided, however, the Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by that Holder and the Debtor.

Subject to the other provisions of the Plan, all reasonable fees for services rendered after the Confirmation Date in connection with the Chapter 11 Case and the Plan, including those relating to the resolution of pending Claims, shall be paid by the Debtor without further Bankruptcy Court authorization.

Notwithstanding any provision in the Plan regarding payment of Administrative Claims to the contrary, and without waiver of any argument available that such Claim is already time-barred by prior orders of the Bankruptcy Court, all Holders of Administrative Claims, other than Holders of Professional Fee Claims, that have not been paid as of the Effective Date, must file a request for payment of Administrative Claims with the Bankruptcy Court and serve the same on the Debtor and the US Trustee such that it is received no later than 30 days after the conclusion of the Confirmation Hearing, or such Claim shall be forever barred and shall not be enforceable against the Debtor or their successors, assigns or property. An objection to an Administrative Claim must be filed within 60 days from the date such Claim is Filed.

The Debtors outstanding Administrative Claims are as follows:

| Creditor/Holder | Claim Amount |
|---|---|

| None known at this time | $0 |
|---|---|

### B.) Professional Fee Claims

The Bankruptcy Court must rule on all Professional Fee Claims before the fees will be payable. For all Professional Fee Claims except the Clerk's Office fees and US Trustee's fees, the Professional in question must file and serve a properly noticed fee application and the Bankruptcy Court must rule on the application. Only the amount of fees allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered prior to the Confirmation Date must File and serve (pursuant to the notice provisions of administrative order(s) entered by the Bankruptcy Court on interim compensation of Professionals), an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. Holders of Professional Fee Claims requesting compensation or reimbursement of expenses that do not file such requests by the applicable bar date shall be forever barred from asserting such Claims against the Debtor or their successors, assigns or property. Any objection to Professional Fee Claims shall be filed on or before the date specified in the application for final compensation.

The Debtor's outstanding Professional Fee Claims are as follows:

| Creditor/Holder | Claim Amount |
|---|---|
| None at this time | $0 |

### C.) Priority Tax Claims

Each Holder of such an Allowed Priority Tax Claim shall be paid 100% of their Allowed Claim, with interest at the applicable rates, via Cash installment payments with the first payment beginning on the latter of the Effective Date (or as soon thereafter as Cash is available) or within 30 days after the such Claims become Allowed Claims (provided, however, the Holder of an Allowed Priority Tax Claim may be paid on such other date and upon such other terms as may be agreed upon by that Holder and the Debtor.); and thereafter a minimum of one payment every 90

calendar days until each Claim is paid in full. All Priority Tax Claims shall be paid in full no later than 450 days from the Effective Date. Whenever a payment is due, the minimum amount to be paid shall be $1,500 per Claim Holder, however, the Debtor, at his sole discretion, may choose to pay more than $1,500, based upon the Available Funds at the time that any payment becomes due.

As of the Petition Date, the Debtor's outstanding Priority Tax Claims are as follows:

| Creditor/Holder | Claim Amount |
| --- | --- |
| Idaho State Tax Commission | $2,103.13 |
| Internal Revenue Service | $12,914.97 |
| *Total* | *$15,018.10* |

### Classification and Treatment of Classified Claims

The categories of Claims and listed below classify Claims and for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that such Claim is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The classification and treatment of Claims pursuant to the Plan are as follows:

A.) *Class 1 - Secured Tax Claims [Ada County Treasurer]* – *(Unimpaired)*

This Class consists of multiple Allowed Secured Claims held by the Ada County Treasurer in Ada County, Idaho, resulting from delinquent property taxes for 2016, 2017 and 2018. These Claims are secured by statutory Liens against many of the Debtors' real properties located in Ada County, Idaho.

The Creditor in this Class shall be paid 100% of its Allowed Claims, with interest at the rate of 12% per annum, calculated from the Petition Date, via Cash installment payments with the first payment beginning on or before the Initial Distribution Date; and thereafter a minimum of one payment every 90 calendar days until each Claim is paid in full. All Claims within this

Class shall be paid in full no later than 450 days from the Effective Date, and the Creditor shall retain each Lien until the corresponding Claim is paid in full.

Whenever a payment is due, the minimum amount to be paid to the Creditor shall be $1,500, however, the Debtor, in his sole discretion, may choose to pay more than $1,500, based upon the Available Funds at the time that any payment becomes due.

Upon the sale of any property that is subject to the Liens securing these Claims, such sale shall be free and clear of any such Liens and such Liens shall attach to the proceeds of such sale.

As of the Petition Date, the total unpaid principal and interest on these Claims is $39,997.26.

B.) *Class 2 – Secured Claims [Bank-Originated Mortgages]* – *(Unimpaired)*

This Class consists of several Allowed Secured Claims, stemming from bank-originated mortgage contracts between the Debtors and each Creditor. These Claims are secured by mortgages/deeds of trust against several of the Debtors' real properties located in Ada County, Idaho.

The Creditors in this Class shall be paid 100% of their Allowed Claims, in accordance with the terms and conditions of their respective mortgage contracts. The Debtor is current on all payments for these Claims and shall continue to make future payments in accordance with the terms and conditions of each mortgage contract. All terms and conditions of the mortgage contracts between the Debtor and the Creditors shall remain unchanged, including maturity dates.

Upon the sale of any property that is subject to the Liens securing these Claims, such sale shall be free and clear of any such Liens and such Liens shall attach to the proceeds of such sale.

As of the Petition Date, the total unpaid principal and interest for these Claims is detailed as follows:

| Creditor | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | $103,333.11 | $102,434.66 | $102,434.66 |
| Ocwen Loan Servicing, LLC / U.S. Bank, N.A. | $75,208.37 | $76,323.65 | $76,323.65 |
| Wells Fargo Bank, N.A. / | $72,692.45 | $73,709.67 | $73,709.67 |

| Deutsche Bank National Trust Co | | | |
|---|---|---|---|
| *Total* | *$251,233.93* | | *$252,467.98* |

C.) <u>*Class 3 – Secured Claims [Richard Zamzow]*</u> – *(Impaired)*

    This Class consists of two Allowed Secured Claims, whether disputed or not, stemming from two promissory note agreements between the Debtor and Creditor, Richard Zamzow. These claims are secured by deeds of trust against several of the Debtor's real properties located in Ada County, Idaho.

    The Creditor filed a motion for relief from the automatic stay in August, 2019 and on December 11, 2019, the Debtors and the Creditor were able to work out an agreement to resolve the Creditor's motion based upon the following stipulations:

    a) The Debtor shall commence making adequate protection payments to Creditor in the amount of $1,500.00 by the last day of each month commencing December 2019 and going thru through April 30, 2020.

    b) The Debtor shall file a Plan and Disclosure Statement by January 30, 2020.

    c) The Debtor shall pay the Creditor in full, including all principal, interest and reasonable fees and costs by April 30, 2020.

    d) The Creditor shall provide Notice of the agreement to all creditors and interested parties.

    e) In the event of Debtor's default under the terms of the agreement, the Creditor shall provide Notice of the default to the Court.

    f) Upon providing such Notice, the Creditor shall be entitled to an order for stay relief for the properties securing the Creditor's Claims.

    The Creditor shall be entitled to post-petition interest at the contract rate relevant to each Claim, calculated from the Petition Date until the Claims are paid in full.

    Upon the sale of any property that is subject to the Liens securing these Claims, such sale shall be free and clear of any such Liens and such Liens shall attach to the proceeds of such sale.

    As of the Petition Date, the total unpaid principal and interest for these Claims is detailed as follows:

| Claim No. | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|

| 16-1 | $557,589.04 | $556,822.18 | $556,822.18 |
| 17-1 | $919,101.03 | $955,763.70 | $955,763.70 |
| *Total* | *$1,476,690.07* | | *$1,512,585.88* |

D.) *Class 4 – Secured Claims [Over-secured]* – *(Impaired)*

   This Class consists of several Allowed Secured Claims not classified elsewhere, whether disputed or not, each of which are over-secured, and all stemming from promissory note agreements between the Debtors and each Creditor. Two of these Claims are secured by deeds of trust against two of the Debtors' real properties located in Payette County, Idaho and the third Claim is secured by personal property of the Debtors in the form of a front-end loader.

   The Creditors in this Class shall be paid 100% of their Allowed Claims, with interest at the rate of 3% per annum, calculated from the Petition Date, via interest-only payments with the first payment beginning on or before the Initial Distribution Date; and thereafter a minimum of one payment every 90 calendar days until each Claim is paid in full. All Claims within this Class shall be paid in full no later than 450 days from the Effective Date, and each Creditor shall retain their Lien until their Claim is paid in full.

   The Debtors and each Creditor shall retain their rights to negotiate a settlement whereby the Debtors may convey the secured property to the Creditor, in satisfaction, in whole or in part, of the relevant Secured Claim.

   Upon the sale of any property that is subject to the Liens securing these Claims, such sale shall be free and clear of any such Liens and such Liens shall attach to the proceeds of such sale.

   As of the Petition Date, the total unpaid principal and interest for these Claims is detailed as follows:

| Creditor | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
| --- | --- | --- | --- |
| David Kennison | $124, 087.46 | | $124, 087.46 |
| Jessie Rose / Rose Family Trust | $281,495.40 | | $281,495.40 |
| Richard Zamzow | $72,000 | $100,000 | $100,000 |
| *Total* | *$477,582.86* | | *$505,582.86* |

E.) *Class 5 – Secured Claims [Under-secured]* – *(Impaired)*

This Class consists of several Allowed Secured Claims not classified elsewhere, whether disputed or not, each of which are under-secured, and all stemming from promissory note agreements between the Debtors and each Creditor. Two of these Claims are secured by deeds of trust against several of the Debtors' real properties located in Ada County and Payette County, Idaho and the third Claim is secured by personal property of the Debtors in the form of an excavator and forklift.

The Creditors in this Class shall be paid 100% of their Allowed Claims, with interest at the rate of 3% per annum, calculated from the Confirmation Date, via interest-only payments with the first payment beginning on or before the Initial Distribution Date; and thereafter a minimum of one payment every 90 calendar days until each Claim is paid in full. All Claims within this Class shall be paid in full no later than 450 days from the Effective Date, and each Creditor shall retain their Lien until their Claim is paid in full. Each Creditor in this Class shall also have a general Unsecured Claim in the amount of their Secured Claim deficiency.

The Debtors and each Creditor shall retain their rights to negotiate a settlement whereby the Debtors may convey the secured property to the Creditor, in satisfaction, in whole or in part, of the relevant Secured Claim.

Upon the sale of any property that is subject to the Liens securing these Claims, such sale shall be free and clear of any such Liens and such Liens shall attach to the proceeds of such sale.

As of the Petition Date, the total unpaid principal and interest for these Claims is detailed as follows:

| Creditor | Scheduled Amount | Proof of Claim Amount | Deficiency Amount | Allowed Secured Amount |
|---|---|---|---|---|
| Gene Louie | $287,621.23 | | $52,621.23 | $235,000 |
| James Belenis | $773,886.13 | | $102,886.13 | $671,000 |
| Richard Gannon | $155,589.04 | | $35,589.04 | $120,000 |
| *Total* | *$1,217,096.4* | | *$191,096.4* | *$1,026,000* |

F.) *Class 6 – General Unsecured Claims* – *(Impaired)*

This Class consists of all Allowed Unsecured Claims not classified elsewhere, including Disputed Claims to the extent the Disputed Claims may be proven and allowed by the Court.

The Creditors in this Class shall be paid 100% of their Allowed Claims, with interest at the rate of 2% per annum, calculated from the Confirmation Date. All Claims within this Class shall be paid in full no later than 450 days from the Effective Date.

No payments shall be required during the 450 day period, however, the Debtor, in his sole discretion, may choose to make one or more payments toward these Claims, but no such payments shall be made until all Allowed Administrative, Priority and Secured Claims are paid in full. In the event that the condition precedent stated above is met, and the Debtors choose to make any such payment to this Class of Claims, the amount paid for any such payment shall be divided among all the Claims according to their Pro Rata share. The amount of any such payment shall be at the sole discretion of the Debtor, based upon Available Funds at the time of such payment.

As of the Petition Date, the total unpaid principal and interest for these Claims is detailed as follows:

| Creditor | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| Alvin Hohbach | $32,674.44 | | $32,674.44 |
| Barbara Little | $45,000 | | $45,000 |
| Beck Gold Creek Ranch, LLC | $581,301 | $581,301 | $581,301 |
| Brad Schuppan | $148,254.24 | | $148,254.24 |
| Brian Webb Legal | $6,894.50 | | $6,894.50 |
| Carolyn Cannon | $24,853.04 | | $24,853.04 |
| Citibank, N.A. | $7,699.87 | | $7,699.87 |
| City of Fruitland | $3,543.67 | | $3,543.67 |
| David Sikkema | $49,670 | | $49,670 |
| Discover Bank | $6,211.85 | $6,211.85 | $6,211.85 |
| Discover Bank | $15,033.61 | $15,061.50 | $15,061.50 |
| Free River LLC | $20,717 | | $20,717 |
| Gene Louie | $52,621.23 | | $52,621.23 |
| Glen Alleman | $60,232.88 | | $60,232.88 |
| Idaho State Tax Commission | $0 | $2,400.84 | $2,400.84 |

| Internal Revenue Service | $9,416.07 | $9,416.07 | $9,416.07 |
|---|---|---|---|
| James Belenis | $102,886.13 | | $102,886.13 |
| Jeremy Pixton | $157,934.25 | | $157,934.25 |
| John Chapman | $73,452.05 | | $73,452.05 |
| JPMorgan Chase Bank, N.A. | $13,830 | | $13,830 |
| KeyBank N.A. | $44,470.28 | $45,603.05 | $45,603.05 |
| KeyBank N.A. | $7,304.55 | $6,704.64 | $6,704.64 |
| Knife River Corporation - Northwest | $830,829.60 | $731,245.79 | $731,245.79 |
| Michael Dixon | $737,836.61 | | $737,836.61 |
| Michael Purtill | $73,178.63 | | $73,178.63 |
| Milodragovich, Dale & Steinbrenner, P.C. | $74,322.06 | $74,322.06 | $74,322.06 |
| Nickolas Louie | $119,904.11 | | $119,904.11 |
| Norco, Inc C/O Professional Credit Service | $822 | $828.73 | $828.73 |
| Olexander Hnojewyj | $77,220.27 | $77,122.24 | $77,122.24 |
| Portfolio Recovery Associates / Citibank, N.A. | $4,892 | $4,892.28 | $4,892.28 |
| Portfolio Recovery Associates / Capital One Bank (USA), N.A. | $20,762 | $20,762.10 | $20,762.10 |
| Richard Gannon | $35,589.04 | | $35,589.04 |
| Sally McMinn | $48,500 | | $48,500 |
| Tyson Jones | $25,000 | | $25,000 |
| U.S. Bank, N.A. | $16,686.54 | | $16,686.54 |
| U.S. Bank, N.A. / Capital Management Services, LP | $680.24 | | $680.24 |
| Walter & Tina Kightly | $28,326.7 | | $28,326.70 |
| Wellington Pierce | $132,452.61 | | $132,452.61 |
| *Total* | *$3,691,003.07* | | *$3,594,289.93* |

G.) *Class 7 – Equity Interests* – *(Unimpaired)*

This class consists of all the equity interests of the Debtor in Estate property as of the Petition Date. These interests shall remain unchanged and the Debtor shall retain all such interests as they existed on the Petition date.

## Acceptance or Rejection of the Plan

A.) Voting Classes

Because they are Impaired, each Holder of an Allowed Claim in Classes 3, 4, 5 and 6 is entitled to vote to either accept or to reject the Plan. Only those votes actually cast by Holders of Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.

B.) Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount and (b) more than one-half in number of the Allowed Claims actually voting in such Class, have voted to accept the Plan.

C.) Presumed Acceptance of Plan

Classes 1, 2 and 7 are Unimpaired and not entitled to vote and are therefore conclusively deemed to have accepted the Plan.

## Effect of Confirmation

A.) Vesting of Cash and Assets in the Debtor

Except to the extent otherwise provided in the Plan or restricted by prior order of the Bankruptcy Court, on the Effective Date, all right, title and interest in the Assets of the Estate shall be transferred to and vest in the Debtor free of any Claims and Liens, to be managed and used for the sole purposes of achieving Consummation and carrying out the Plan and effectuating the Distributions provided for in the Plan.

As of the Effective Date, all property of the Debtor shall be free and clear of all Claims, except as otherwise specifically provided in the Plan. As of the Effective Date, all mortgages,

deeds of trust, Liens or security interests in any property of the Estate will be released and all the right, title and interest of any Holder of any such mortgages, deeds of trust, Liens or security interests shall be canceled, annulled, terminated and become null and void, except as otherwise specifically provided in the Plan. The Debtor shall be authorized to act as attorney-in-fact for any such Holder to cause all public records to properly reflect and effectuate this provision. If the Confirmation Order is ever reversed or revoked, this provision of the Plan shall become null and void, and all Liens existing before the Confirmation Date shall be revived.

B.) <u>Authority to Effectuate Plan</u>

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan shall be deemed authorized and approved without further approval from the Bankruptcy Court. The Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary, including, without limitation, hire Professionals, to achieve Consummation and carry out the Plan and to effectuate the Distributions provided for thereunder. The Debtor shall be authorized to retain, use, lease, abandon, invest, sell or encumber any Assets without further approval from or order of the Bankruptcy Court. With respect to any actions, that may be taken by the Debtor, that would encumber any Asset, such encumbrances or Liens shall be junior to the Liens, of remaining Secured Claims, if any, provided for under Article III of the Plan.

C.) <u>Binding Effect</u>

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan and all exhibits thereto shall bind all Holders of Claims.

D.) <u>Limitation of Liability</u>

Except as expressly set forth in the Plan, on and after the Confirmation Date neither the Debtor, his successors, assigns, agents, representatives, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, and Professionals and agents for the foregoing shall have or incur any liability for, and are expressly exculpated, released, and discharged from, any claim (as defined in section 101(5) of the Bankruptcy Code) or any past or present actions taken or omitted to be taken under or in connection with, related to, effecting, or

arising out of the following: (i) the Debtor's operations after the Petition Date or the Effective Date; (ii) the Chapter 11 Case; (iii) the post-petition administration of the Debtor's Cash, Assets, and real and personal property; (iv) the pursuit of Confirmation; (v) the formulation, preparation, dissemination, implementation, administration, confirmation, or Consummation of the Plan and the Disclosure Statement; (vi) the sale and liquidation of any of the Debtor's Assets, or the property to be distributed under the Plan; (vii) any other act taken or omitted to be taken in connection with the Debtor's business after the Petition Date or Effective Date; or (viii) any contract, instrument, release, or other agreement entered into or created in connection with the foregoing; except only for actions or omissions to act to the extent determined by a court of competent jurisdiction (in a Final Order) to be by reason of such party's gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; it being expressly understood that any act or omission with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation.

E.) <u>Injunction</u>

On and after the Confirmation Date, all persons are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right or cause of action (i) of the Debtor for which the Debtor retains sole and exclusive authority to pursue in accordance with the Plan, or (ii) that seeks to enforce a Claim against the Debtor or property of the Debtor or of the Estate, except that such an action or proceeding may be maintained solely for the purpose of enforcing an Entity's rights under this Plan.

Confirmation and performance of this Plan will discharge the Debtor from any and all debts dischargeable under Section 1141(d) of the Bankruptcy Code and will otherwise have all effects provided in such Section 1141, which are not expressly inconsistent with the provisions of this Plan. Pending Consummation of this Plan and unless: (a) the Bankruptcy Court has otherwise expressly ordered; or (b) this Plan otherwise expressly provides, all Creditors will continue to be stayed from proceeding against the Debtor or his assets.

## Implementation of the Plan

A.) Means of Execution of the Plan

The Means to carry out the Plan, effectuate Distributions and achieve Consummation shall be funded through the liquidation, on a going concern basis, of several of the Debtor's Assets, namely several highly marketable parcels of real property located in Ada County, Idaho. In addition, the Debtor may also seek to obtain exit or consolidation financing, in conjunction with asset liquidations, in order to carry out the Plan in an as efficient and expedient manner as possible. Should such exit/consolidation financing be obtained, it would allow the Debtor to satisfy, in whole or in part, current Creditor obligations and consolidate them into a single long-term obligation that is more favorable and more easily managed outside of bankruptcy. The Debtor also reserves the right to negotiate with Creditors, whereby certain Assets may be conveyed to such Creditors in satisfaction, in whole or in part, of such Creditor's Claims.

B.) Duties of the Debtor

The Debtor shall work diligently to liquidate said Assets for the highest value reasonably possible and in as little time as is reasonable. If it is needed and is be in the best interests of Consummating the Plan, the Debtor shall also work diligently to obtain exit/consolidation financing. The Debtor shall use Assets in a manner that is most beneficial and efficient to carrying out the terms of the Plan.

C.) Agents of the Debtor; Payment of Such Agents

In order to carry out his duties under the Plan, the Debtor, in addition to his other rights under the Plan, shall have the right, but not the obligation, and without further approval from or order of the Bankruptcy Court, (a) to retain and compensate professionals (including but not limited to the Professionals retained by the Debtor prior to the Effective Date) and other Persons to assist the Debtor in achieving Consummation of the Plan, and (b) to employ such other procedures not inconsistent with the Plan.

## Treatment of Executory Contracts and Unexpired Leases

A.) Rejection of Executory Contracts and Unexpired Leases

The Debtor reserves the right to assume or reject, pursuant to section 365 of the Bankruptcy Code, any executory contract or unexpired lease not assumed or rejected prior to the Confirmation Date. All executory contracts and unexpired leases not specifically assumed or rejected as of the Confirmation Date or as to which an application to assume shall not be pending on the Confirmation Date shall be deemed rejected. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

B.) Claims Based on Rejection of Executory Contracts or Unexpired Leases

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be Filed with the Bankruptcy Court by any applicable deadline set by Final Order of the Bankruptcy Court and in no event later than thirty (30) days after the Confirmation Date. Any Entity that fails to assert a Claim arising from the rejection of an executory contract or unexpired lease within such time will be forever barred from asserting such Claim against the Debtor and his estate and/or property, unless otherwise ordered by the Bankruptcy Court or provided in the Plan. All such Claims timely filed will be treated as Unsecured Claims.

**Provisions Governing Distributions**

A.) Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, or as may be ordered by the Bankruptcy Court, Distributions on account of those Claims that are Allowed as of the Effective Date and are entitled to receive Distributions under the Plan shall be made on the Initial Distribution Date or as soon thereafter as is practicable. Distributions on account of Claims that become Allowed after the Effective Date shall be made pursuant to the provisions of the Plan.

B.) Manner of Payment

Any payment of Cash made under the Plan may be made either by check drawn on a domestic bank, by wire transfer, or by automated clearing house transfer from a domestic bank, at the option of the Debtor.

Under section 1146(a) of the Bankruptcy Code, the making or delivery of an instrument of transfer under a plan may not be taxed under any law imposing a stamp tax or similar tax. Pursuant thereto and because the Debtor shall be selling Assets hereunder, entry of the Confirmation Order shall be a determination that no stamp tax, transfer tax or similar tax may be imposed on any sale of property by the Debtor.

C.) <u>Transmittal of Distributions to Parties Entitled Thereto</u>

All Distributions by check shall be deemed made at the time such check is duly deposited in the United States mail, postage prepaid. All Distributions by wire transfer shall be deemed made as of the date the Federal Reserve or other wire transfer is made. Except as otherwise agreed with the Holder of an Allowed Claim in respect thereof or as provided in the Plan, any property to be distributed on account of an Allowed Claim shall be distributed by mail, upon compliance by the Holder with the provisions of the Plan, to (a) the latest mailing address Filed for the Holder of an Allowed Claim entitled to a Distribution; (b) the latest mailing address Filed for a Holder of a Filed power of attorney designated by the Holder of such Claim to receive Distributions; (c) the latest mailing address Filed for the Holder's transferee as identified in a Filed notice served on the Debtor pursuant to Bankruptcy Rule 3001(e); or (d) if no such mailing address has been Filed, the mailing address reflected on the Schedules or in the Debtor's books and records.

D.) <u>Disputed Claims and Unclaimed Property</u>

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims under the Plan, including the determination of the amount of Distributions due to the Holders of Allowed Claims, each Disputed Claim shall be treated as if it were an Allowed Claim, as appropriate, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or otherwise determines the amount for such Disputed Claim, such amount as determined by the Bankruptcy Court shall be used as to such Claim.

After an objection to a Disputed Claim is withdrawn or determined by Final Order, the Distributions due on account of any resulting Allowed Claim shall be paid by the Debtor to such Creditor in accordance with the frequency, amounts and manner of Distribution for the Class of the Claim of such Creditor. No interest shall accrue to a Disputed Claim based on the delay attendant to determining the allowance of such Claim.

At the Debtor's election, any property that is unclaimed for 90 days after Distribution thereof by mail to the last known mailing address of the party entitled thereto, such Distribution shall revest in the Debtor as Available Funds for ongoing costs and fees or for distribution to other Creditors. Notwithstanding the foregoing, if any Distribution, that is sent by mail to a Creditor at the last known mailing address by the Debtor, is returned without a forwarding address and the Creditor does not claim their Distribution within 90 days after it is mailed to the Creditor, the Debtor may strike the Creditor's Claim from the Creditor list, issue no more checks to such Creditor and, for the purposes of future Distributions, treat the Claim as if it were disallowed.

E.) Saturday, Sunday or Legal Holiday

If any payment, Distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or Distribution or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## Procedures for Resolving Disputed Claims

A.) Prosecution of Objections to Claims

Unless another time is set by order of the Bankruptcy Court, all objections to Claims shall be Filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made no more than 180 days after the Effective Date. The Debtor, however, may seek an extension of time to object to Claims. If no objection has been filed to a Claim within the periods set forth in this paragraph (as such periods may be extended by the Bankruptcy Court), then such Claim shall be Allowed.

Except as set forth in the Plan, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the commencement of the Chapter 11 Case, against or with respect to any Claim. Except as set forth in the Plan, upon Confirmation, the Debtor shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtor had immediately prior to the commencement of the Chapter 11 Case as if the Chapter 11 Case had not been commenced.

## B.) Estimation of Claims

The Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

## C.) Cumulative Remedies

All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Until such time as such Administrative Claim or Claim becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim or Disputed Claim for purposes related to allocations, Distributions, and voting under the Plan.

## D.) Payments and Distributions on Disputed Claims

Notwithstanding any provision in the Plan to the contrary, no payments or Distributions will be made with respect to a Disputed Claim until the resolution of such disputes by settlement or Final Order. Unless otherwise agreed, a Creditor who holds both an Allowed Claim and a Disputed Claim, will not receive a Distribution until such dispute is resolved by settlement or Final Order.

E.) Allowance of Claims

   1.) Disallowance of Claims

All Claims held by Entities against whom the Debtor has asserted a Cause of Action under sections 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such Causes of Action against that Entity have been settled or resolved by a Final Order and all sums due the Debtor by that Entity are turned over to the Debtor.

   2.) Allowance of Claims

Except as expressly provided in the Plan, no Claim shall be deemed Allowed by virtue of Confirmation, or any order of the Bankruptcy Court in the Chapter 11 Case, unless and until such Claim is deemed Allowed under the terms of this Plan.

F.) Controversy Concerning Impairment

If a controversy arises as to whether any Claims or any Class of Claims are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtor's interpretation of the Plan shall govern.

G.) Claims Disputed by Debtor

At this time, the Debtor disputes the following Claims as follows:

   1.) Beck Gold Creek Ranch, LLC (Claim 21-1) – Disputed in its entirety.

   2.) Knife River Corporation – Northwest (Claim 11-1) – Disputed in its entirety.

   3.) Milodragovich, Dale & Steinbrenner, P.C. (Claim 14-1) – Disputed in its entirety.

4.) Richard Zamzow (Claims 15-1, 16-1 and 17-1) – Disputed as to amount.

5.) Runft & Steele Law Offices (Claim 10-1) – Disputed as to amount.

## Causes Of Action

A.) Maintenance of Causes of Action

Except as otherwise provided in the Plan, any Cause of Action under any theory of law, including without limitation under the Bankruptcy Code, accruing to the Debtor shall remain an Asset of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall be transferred to and vest in the Debtor.

## Conditions Precedent to Confirmation and Consummation of the Plan

A.) Condition Precedent to Confirmation

It is a condition to Confirmation that (a) the Confirmation Order shall approve in all respects all of the provisions, terms and conditions of the Plan, and (b) the Confirmation Order is satisfactory to the Debtor in form and substance.

B.) Conditions Precedent to Consummation

It is a condition of Consummation that (a) the Confirmation Order shall have been signed by the Bankruptcy Court and duly entered on the docket for the Chapter 11 Case by the Clerk of the Bankruptcy Court in form and substance acceptable to the Debtor; and (b) the Confirmation Order shall be a Final Order.

C.) Waiver of Conditions

The Debtor may waive any of the conditions of the Confirmation and/or Consummation of the Plan, in whole or in part, set forth in this Article XI at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to obtain Confirmation and/or achieve Consummation of the Plan.

D.) Effect of Non-Occurrence of Conditions to Consummation

If the Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any equity interests in, the Debtor, his property or property of the Estate; (b) prejudice in any manner the rights of the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor in any respects.

## Retention of Jurisdiction

Notwithstanding Confirmation or the Effective Date having occurred, the Chapter 11 Case having been closed, or a Final Decree having been entered, the Bankruptcy Court shall have jurisdiction of matters arising out of, and related to the Chapter 11 Case and the Plan under, and for the purposes of, sections 105(a), 1127, 1142 and 1144 of the Bankruptcy Code and for, among other things, the following purposes:

1.) to allow, disallow, determine, liquidate, classify, estimate or establish the priority or status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

2.) to grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan;

3.) to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date to the list of executory contracts and unexpired leases to be rejected;

4.) to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including ruling on any motion or objection Filed pursuant to the Plan;

5.) to decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor or his affiliates, agents or professionals that may be pending on the Effective Date;

6.)    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

7.)    to resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Person's or Entity's obligations incurred in connection with the Plan, including, among other things, any avoidance actions or subordination actions under sections 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code;

8.)    to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan, except as otherwise provided herein;

9.)    to resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article V hereof and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

10.)    to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

11.)    to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement;

12.)    to enter an order and/or Final Decree concluding the Chapter 11 Case;

13.)    to consider any modification of the Plan under section 1127 of the Bankruptcy Code and/or modification of the Plan before "substantial consummation" as defined in section 1101(2) of the Bankruptcy Code;

14.)    to protect the property of the Estate from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of the Plan, or to determine the Debtor's exclusive ownership of claims and Causes of Action retained under the Plan;

15.)    to hear and determine matters pertaining to abandonment of property of the Estate;

Debtors' Plan of Reorganization          25

16.) to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

17.) to interpret and enforce any orders previously entered in the Chapter 11 Case to the extent such orders are not superseded or inconsistent with the Plan;

18.) to recover Assets of the Debtor and property of the Estate, wherever located;

19.) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 345, 505, and 1146 of the Bankruptcy Code;

20.) to hear and act on any other matter not inconsistent with the Bankruptcy Code;

21.) to consider and act on the compromise and settlement of any litigation, Claim against or Cause of Action on behalf of the Estate; and

22.) to interpret and enforce the injunctions contained in the Confirmation Order.

### Liquidation Analysis

The Debtor is proposing a Reorganization Plan where most of his Assets will be retained, but some of them shall be liquidated in order to fund the Plan satisfy Creditor obligations. The Plan must provide that a non-consenting impaired Creditor of consenting class receive at least as much as he would if the Debtor's Estate were to be liquidated under a Chapter 7 liquidation case.

In a Chapter 7 case, the general rule is that the Debtor's assets are sold by a trustee, usually at "fire-sale/liquidation" values. The unsecured creditors get paid only after administrative claimants, priority claim holders and secured creditors are paid in full. Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their Allowed Claim relative to the total amount of allowed claims within the class that their claim is classified under.

Estimated valuations for a liquidation of the Debtors Assets are detailed as follows:

| Asset | Market/Going-Concern Values | Liquidation Values |
|---|---|---|
| Real Property | $11,100,000 | $6,500,000 |
| Vehicles | $317,000 | $65,000 |
| Personal/Household Items | $40,000 | $10,000 |

| Financial/Equity/Business Holdings | $10,764,000 | $2,500,000 |
|---|---|---|
| Trade Tools, Supplies, etc | $12,000 | $3,000 |
| Misc Property | $140,000 | $30,000 |
| *Total* | *$22,373,000.00* | *$9,108,000.00* |

In a Chapter 7 scenario, general unsecured creditors would receive much less return on their claims than under the Debtor's Plan in Chapter 11 for several reasons. First, the Debtor estimates the value of the Debtor's assets under a full on liquidation scenario to range anywhere from 50% to 80% less, depending on the asset, than market/going concern value. Several of the Debtors Asset holdings are not readily marketable, or downright impossible to market in some instances. Though some of the more highly marketable holdings (real property) have significant equity, the recovery from them is likely to be drastically reduced because many are encumbered by secured claims and if sold under liquidation circumstances, most, in not all in some cases, of the equity would be lost.

Additionally, in a Chapter 7 case, a trustee is appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all money disbursed, 10% on any amount over $5,000 but less than $1,000,000, 5% on all amounts over $1,000,000 but less than $3,000,000, and reasonable compensation not to exceed 3% on any amount over $3,000,000, in addition to compensation of any professionals that the trustee may employ, thus diminishing monies available for payment to unsecured creditors even more.

Assuming the Debtor had to liquidate its assets as indicated above and pay off the claims of secured creditors, it is likely the Debtor would be left with drastically reduced funds for payment to general unsecured creditors.

Thus, if there were a liquidation of assets, the Debtor believes that general unsecured creditors would receive significantly less than is being proposed in Debtor's Plan, due to the nature and amount of the secured claims against the Debtor's assets and the nature and value of such assets, as well as reduced recoveries due to assets being sold at highly reduced values.

Furthermore, even if there were adequate amounts to pay general unsecured creditors in full on liquidation, which is highly doubtful, the Debtor's Plan proposes payment in full with

accruing interest and general unsecured claims would not receive more from a chapter 7 liquidation.

### Plan Feasibility

The Debtor believes that the Plan is feasible based upon the high marketability of the real properties to be sold. The Debtor projects that, if sold, the high value and high equity of the subject properties would generate enough proceeds to pay most if not all creditors within a 6-8 month timeline. By establishing a deadline of 450 days to fully pay all Creditors, the Debtor is allowing a reasonable amount of cushion in order to successfully market the properties, thereby increasing the chances of consummating sales of the properties at the best possible values. The Debtor also has several viable options to obtain exit/consolidation financing that may be used in combination with the property sales in order to achieve Consummation.

### Miscellaneous Provisions

A.) Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C § 1930 shall be paid on or before the Initial Distribution Date. The Debtor shall pay fees that accrue under 28 U.S.C. § 1930 until a Final Decree is entered in the Chapter 11 Case, or the Bankruptcy Court otherwise orders.

B.) Modification of Plan

The Debtor reserves, in accordance with the Bankruptcy Code, the right to amend or modify the Plan prior to the entry of the Confirmation Order.

Prior to entry of the Confirmation Order, the Plan may only be modified with the consent of the Debtor. After the entry of the Confirmation Order, the Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, if (a) the Plan has not been substantially consummated and (b) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

C.) Revocation of Plan

The Debtor reserves the right to withdraw the Plan at any time before the entry of the Confirmation Order. If any of the following events occur: (a) the Debtor revokes or withdraws the Plan; (b) the Confirmation Order is not entered; (c) the Effective Date does not occur; (d) Consummation of the Plan is not substantially achieved; or (e) the Confirmation Order is reversed or revoked, then, at the option of the Debtor, the Plan shall be deemed null and void. In any of those events, nothing contained in the Plan shall be deemed to constitute a waiver of any claim by the Debtor, or to prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor.

D.) Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

E.) Reservation of Rights

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, except as expressly set forth herein. The filing of the Plan, the statements or provisions contained therein, or the taking of any action by the Debtor with respect to the Plan shall not be, or shall not be deemed to be, an admission or waiver of any rights of the Debtor with respect to the Holders of Claims prior to the Effective Date.

F.) No Release

Except as otherwise provided in the Plan, no Entity and/or any such Entity's parent, subsidiaries, affiliates, related Entities, officers, directors, agents and/or employees shall be released and/or discharged of any liabilities under the Plan except as specifically provided in the Plan. Consequently, except as specifically provided in the Plan, all Entities shall remain liable to the extent presently provided under any applicable law with respect to any claims against any such Entities.

G.) Post-Confirmation Effectiveness of Proofs of Claims

Proofs of Claims shall, upon the Effective Date, represent only the right to participate in the Distributions contemplated by the Plan and otherwise shall have no further force or effect.

H.) Further Assurances

The Debtor and all Holders of Claims receiving Distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

I.) Entire Agreement

The Plan supersedes all prior discussions, understandings, agreements, and documents pertaining or relating to any subject matter of the Plan.

J.) Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Case, including any of the matters set forth in the Plan, the Plan shall not prohibit or limit the exercise of jurisdiction by any other court of competent jurisdiction with respect to such matter.

K.) Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the internal laws of the State of Idaho shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to the conflict of law provisions of the State of Idaho.

L.) Headings

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner shall affect the provisions or interpretation(s) of the Plan.

M.) Notices

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by first class U.S. mail, postage prepaid to:

Gordon Jones and Vicki L Jones
8840 W River Beach Ln
Garden City, ID

### N.) Filing of Additional Documents

On or before the Effective Date, the Debtor may File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### O.) Severability

The provisions of the Plan shall not be severable unless such severance is agreed to by the Debtor, and such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

### P.) Notice of Default under the Plan

Unless otherwise agreed, no default shall be declared under the Plan unless any payment or performance due under the Plan (other than a payment required on the Effective Date) shall not have been made or deemed made 30 days after written notice of the default is received by the Debtor. Any notice of default shall (a) conspicuously state that it is a notice of default; (b) describe with particularity the nature of the default, including a reference to the specific provisions of the Plan as to which a default or defaults have allegedly occurred; and (c) describe any action required to cure the default, including the exact amount of any payment required to cure such default, if applicable. The Debtor shall have the right to bring the issue of default before the Bankruptcy Court. At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtor to cure the default in a reasonable period of time.

Dated: January 29, 2020

_____

Gordon Jones

_____

Vicki L Jones