| | |
|---|---|
| **From:** | Deborah Jenson |
| **Sent:** | Tuesday, January 5, 2021 11:11 AM |
| **To:** | Amie Duong |
| **Subject:** | FW: Case 19-00138-JMM |
| **Attachments:** | 43-101Report.10-25-20.OGDEN.pdf; Operating Agreement.pdf; Please_DocuSign_omm_development.pdf; HPSCAN_20201123224221021_2020-11-23_225104368.pdf |

**From:** Bob Austin <bballnow@gmail.com>
**Sent:** Wednesday, December 16, 2020 10:20 AM
**To:** Deborah Jenson <Deborah_Jenson@id.uscourts.gov>
**Subject:** Fwd: Case 19-00138-JMM

**CAUTION - EXTERNAL:**

Via Deborah Jenson,

Honorable Judge Joseph Meier,

It has come to our attention that in the case 019-00138-JMM that Gordon Jones was not fully truthful in his assets that may alter decisions by creditors or the court. Mr. Gordon and his wife Vicki Jones own a LLC and property worth a substantial amount of money. The asset value to the property is north of $14B. I have enclosed a copy of the deed, LLC operating agreement and recent valuation of the property. Additionally Mr. Jones agreed to a loan for $35m against said asset I believe without the courts authorization. I'm a concerned citizen and will allow facts for you to review and decide what, if any, crimes have happened.

--

Bob Austin
509-808-6852

--

Bob Austin

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# Geodyssey
**Geological Consultants**
**4650 Malad Street**
**Boise, ID  83705**
**(208) 283-2100 Phone**


## October 25,  2020

Gordon Jones
8840 W. River Beach Lane
Boise, ID  83714


**Transmission by email**

**RE:  Ogden Mountain Placer Deposit, Powell County, Montana 43-101 Report, revisions
and update.**


### INTRODUCTION

The Ogden Mountain Placer Deposit is located approximately 10 miles southwest of Lincoln,
Montana in parts of Secs. 15, 16, and 21, T 13 N, R 10 W, Powell County, Montana.  The Ogden
Mountain Placer deposit consists of 5 patented placer claims which total approximately 340 acres
of contiguous, patented placer mining claims surrounded by the Helena National Forest.  The
Ogden Mountain Placer claim group includes the following patented placer claims:  Bluebird
Placer, Grouse Placer, Magpie Placer, Meadow Lark Placer, and the Blackbird Placer.  The
placer claims were patented on November 5, 1964.  The current property owners are Gordon and
Vickie Jones of Boise Idaho.

A preliminary 43-101 Report was completed for Gordon Jones for the Odgen Mountain Placer
Deposit in 2010.  Forty-eight track excavator trenches were completed within the property as part
of the investigation, spaced between 100 and 400 feet apart, the average trench spacing was 200
feet.  Geodyssey was on site during the trenching program to supervise the location of each
trench; log the geology of each trench, to pan placer samples to produce pan concentrate
samples to submit for lab analysis; to supervise the digging of the trenches; to survey the trench
locations; and to complete a geologic investigation report for the Ogden Mountain Placer Deposit.
The trench depths ranged between 6 and 19 feet.  Samples were collected from the majority of
trenches, and the samples were submitted to ALS-Chemex for analysis.  The sample results,
trench locations, and geologic log details were included in the preliminary 43-101 report.  The
report did not include historic mining data within the property.

Geodyssey concluded in the 2010 preliminary 43-101 report that the trenching program defined a
50-acre trench-indicated resource based upon United States Securities and Exchange
Commission guidelines.  The trench indicated resource is equivalent to an inferred resource in
Canadian 43-101 guidelines.  A part of the placer deposit is outlined by trench data, historic data,
geological inference, and projection.  The top of the Placer Deposit is known with reasonable
certainty from surface exposures historic mine workings, and trench data.  The deposit is open to
the south, east, and to the north. Only 50 acres of the 340 acre patented claim group have been
tested to date.

As stated in the initial NI 43-101 report, the trench-indicated resource cannot be considered as a drill proven reserve because there is insufficient drill data and subsurface data to categorically conclude a minable placer deposit occurs within the property. Geodyssey in no way warrants that the grade and tonnage estimates produced in the trenching program suggest a proven reserve exists within the property at the time of the initial 43-101 report. Geodyssey work indicates that gold continuity exists between the trenches, at an unknown grade and tonnage that cannot be verified without further test work, and economic analysis. The 43-101 report indicates that the metal values from the trenches are continuous between the trenches in some areas tested. The report suggested that further work is required to substantiate metal grade continuity, ore tonnage continuity, and economic viability. The purpose of the report was to substantiate the trench results from the 2010 work and outline further work that would be required to move the deposit from an inferred resource to a drill proven reserve.

An NI 43-101 report is typically completed by publicly traded Canadian mining companies, with or without the assistance of a third party. The report is prepared primarily for interested investors, and is not considered to be a technical document, it is a disclosure of information regarding the project. The Ogden Mountain project is not a public entity, therefore a 43-101 is not required until the company becomes a public entity. In addition, mine economic viability also includes an analysis of the mining methods chosen to mine the deposit; metallurgical testing to determine the types of mill equipment and gravity separation equipment required to economically mine the deposit, as well as water management; mined land reclamation; waste to ore analysis; and a mine plan that would be used to forecast gold production; depreciation; and years of mine life. None of these analyses have been completed to date.

The preliminary 43-101 Report was re-evaluated several times for various investment groups between 2010 and 2019. Geodyssey has not been on the property since 2011. Mr. Jones indicates that no mining has taken place within the resource area between 2011 and 2020. In 2017 Mr. Gordon Jones test mined within east edge of the resource area near trench TR-19. The estimated material mined was 3,000 cubic yards. The 3,000 cubic yards of minable resource has been removed from the total place resource cubic yards as part of the report update. Geodyssey cannot confirm or deny the volume mined. Minor amounts of exploration testing have taken place within the property, in 2012, 2013, 2014, and 2015, however, the total acreage of testing amounts to less than 0.2 acre. The grade and tonnage estimated in 2010 is considered to be valid up to 2017, subject to a reduction of total tonnage in the resource, and subject to current metal price fluctuations, which effect the total value of the deposit, but not the grade or tonnage of the deposit.

## OGDEN MOUNTAIN PLACER RESOURCE

The Ogden Mountain Placer Deposit is considered to be a trench-indicated resource (geologic resource) of the purpose of this report, based upon accepted United States Securities and Exchange Commission guidelines, equivalent to an inferred resource by 43-101 guidelines. The placer resource is outlined by trench data, historic data, geological inference, and projection. The top of the placer deposit is known with reasonable certainty from surface exposures, historic mine workings, and trench data. The trench-indicated inferred resource cannot be considered to be a drill proven reserve or a measured reserve by 43-101 standards (or SEC guidelines Proven and Probable Reserve) because there is insufficient drill data and subsurface data to categorically conclude a minable placer reserve exists within the property. In order to categorically state that the geologic resource present is a drill proven minable reserve, the Ogden Mountain Placer Deposit would have to be grid drilled at a minimum grid spacing of 40 by 40 feet, and the distribution of gold within the deposit would have to be better understood in order to accurately determine the total ore tonnage and grade of the deposit. The placer and colluvium continuity

has been established through the trenching program. However, the total extent, thickness, and continuity of the Ogden Mountain Placer Deposit has not been established with certainty through trenching and geologic projection. The Ogden Mountain Placer Deposit has only been partially delineated by the 2010 trenching program. The Ogden Mountain Placer Deposit is open to the west, east, south, north, and in the vertical dimension.

In addition, NI-43-101 guidelines state "in order for a mineral deposit to be a measured reserve, economic factors have to be considered along with geologic factors". Typically, the mining industry standard is to complete a mine feasibility analysis on the deposit to substantiate deposit economic minability. The minimum economic factors that are typically considered include:

1.  **Mining Method Analysis:** based on metallurgical testing of the deposit, gold particle size fraction analysis, and an analysis of the optimal mining method based upon gold distribution, gold size, and optimum mining in tons per hour resulting in the conclusion that the deposit is economic to mine.

2.  **Overburden – Waste to Ore Analysis:** which includes an analysis of the total volume of waste to ore (waste to ore ratio), analysis of the overburden stripping costs, stockpile costs, volume of overburden in the deposit, and an analysis of the gold grade in the overburden and the ore zone.

3.  **Water Management:** an analysis of the volume of water required to efficiently operate mine equipment, and analysis of the volume of water available throughout the summer, and analysis of the volume of water that would be discharged, settling pond design and location analysis, water residency time to clarify the process water, and settling pond construction and reclamation costs.

4.  **Mine Equipment:** an analysis of the optimal mining equipment based upon metallurgical testing of the deposit, ie, the type of equipment that recovers the most gold and bi-product metals at the lowest cost, the type of final recovery equipment to capture fine and coarse-grained gold, final recovery equipment to segregate the black sand from the gold, and an economic analysis of whether bi-product metals are economic to recover.

5.  **Mine Plan:** an analysis of the acreage to be mined per year, a life of mine plan which includes a mine schedule and investment capitalization cost analysis, an analysis of the expected gold ounces to be recovered per day in comparison to the mine cost per day, and an analysis of optimal mine component locations and a mine plan that addresses future mining directions in view of water management and the mine method.

6.  **Final Reclamation Costs:** analysis of the timing of reclamation on a yearly basis, analysis of the reclamation cost per acre of disturbance, and the economics of the reclamation cost in view of gold recovery.

Geodyssey is not aware of any mine feasibility analysis that has been completed on the Ogden Mountain Deposit as of 2020. Therefore, the deposit cannot be considered a measured reserve, or even a resource because no economic feasibility has been completed. In addition, the lack of metallurgical testing to analyze the gold and bi-product particle size distribution and distribution within the placer material, and concentration of metals in the deposit precludes defining the deposit as a reserve or a resource by either 43-101 or SEC standards. Until metallurgical testing is completed, the actual ore and waste tonnages cannot be quantified with certainty. Geodyssey recommended in 2009 that metallurgical testing be completed as the next step in the development of the deposit, along with test mining to determine the "pay zone" thickness and metal distribution in the pay zone and overburden. Geodyssey is not aware of any metallurgical testing that has been completed on the deposit.

**TRENCHING RESULTS**

The following report summarizes preliminary results obtained from a trenching program completed at the Ogden Mountain Placer Deposit in 2010, and updated in 2020. Forty-eight track excavator trenches were completed within the Ogden Mountain property. Geodyssey was on site during the excavator trenching program to supervise the location of each trench; to log the geology of each trench, to pan placer samples to produce pan concentrate samples to submit for analysis; to supervise the digging of the trenches; to survey the trench locations; and to complete a geologic investigation of the Ogden Mountain Placer Deposit.

Excavator trenches were constructed at spacings between 100 and 400 feet within the central part of the Ogden Mountain Placer Deposit. The average trench spacing was approximately 200 feet. Steep terrain, wetland areas, and standing water made it impossible to trench the property on a strict 200 foot by 200 foot grid. Geodyssey concludes the trench spacing was adequate to define the minimum extent of the placer deposit, and the trenching program adequately defined the known extent and character of the placer deposit. The excavator trench depths ranged between 6 and 19 feet. Samples were collected from the majority of the trenches and the samples were submitted to ALS-Chemex for analysis. Granite bedrock was encountered in the bottom of many of the trenches; visible gold was panned in many of the pan concentrate samples; and large quantities of black sand (5-10%) were noted in every trench completed. Minor amounts of scheelite (tungsten); barite (barium); and platinum were also noted in several pan concentrate samples.

A placer resource investigation was completed for the Ogden Mountain Placer Property in the fall of 2010. The resource investigation utilized the assay results from the trenching program of 2010, and did not include historic mining data. The results of the resource investigation indicate that the Ogden Mountain Placer Deposit contains 1,684,620 short tons of placer material located within the central portion of the Patented Placer Deposit. The estimated grade and tonnage of the deposit in 2010 has not changed much as of 2020 except for metal price changes and reduction in tonnage due to 2017 mining. A re-calculation of metal values was completed in 2020, due to changes in Gold prices and is listed in Table 1.

The following assay results were obtained from the 2010 trenching program:

| | |
|---|---|
| Gold average gold grade: | 4.37 ounces per ton |
| Silver average grade: | 0.139 ounces per ton |
| Chromium average grade: | 4.46 ounces per ton |
| Nickel average grade: | 1.02 ounces per ton |
| Titanium average grade: | 84.2 ounces per ton |
| Vanadium average grade: | 5.14 ounces per ton |
| Tungsten average grade: | 1.49 ounces per ton |
| Platinum Palladium grade: | anomalously low in comparison to historic production records |
| Rare Earth Element grade: | anomalously low in comparison to historic production records |

The placer resource investigation indicates that a trench-indicated placer resource of 1,684,620 short tons occurs within the central portion of the Ogden Mountain Placer Deposit as of 2010. As of 2019, a trench-indicated inferred placer resource of 1,681,620 short tons occurs within the central part of the Ogden Mountain Placer Deposit. The average grade of the deposit is shown above. The total calculated U. S. dollar value of the Ogden Mountain Placer Deposit based on October 25, 2020 metal values is $14,014,545,000.00.

A total of 50 acres of the 340 acre Ogden Mountain placer property have been explored during the 2010 trenching program. Geologic relations indicate that the placer deposit has not been fully

delineated, particularly to the east of the 2010 trenching program.  The Ogden Mountain Placer deposit is open to the south, to the west along Wilson Creek; to the east in the upper reaches of drainages that have not been tested to date; and to the north in the colluvium material.  The placer deposit is also open at depth in many locations due to not encountering bedrock at the end of the reach of the track excavator.  Geologic relations suggest that the Ogden Mountain Placer Deposit tonnage could legitimately be doubled or tripled with continued step out trenching from the central part of the placer deposit.

**OGDEN MOUNTAIN ANALYTICAL RESULTS**

Samples were collected from each trench from the 2010 trenching program at the Ogden Mountain Placer Deposit.  Trench samples were collected for the entire trench to obtain a representative composite sample for each trench.  In addition, several of the trenches were sampled at intervals of 0'-5'; 5'-10'; and 10'-15' in order to obtain data regarding precious and base metal distribution within the placer material.  Trench composite samples were sent to ALS-Chemex Minerals for analysis.  The samples were run for a 33 element, four acid ICP-AES (ME-ICP61), and PGM-ICP23 for Platinum, Paladium, and Gold. In addition, high-grade gold samples were re-analyzed by Fire Assay, Gravimetric. Finish.  The sample results are located in Appendix A.  The following sample results were obtained.  The total tonnage outlined from the trenching program as of April 6, 2020 is 1,681,620 short tons.

**Table 1.  Analytical Results, Average Element Grade, Element Value (October 25, 2020 metal prices and Total Element Value). Kitco, Metal Miner, Infomine data.**

| COMMODITY | AVERAGE GRADE | COMMODITY VALUE | TOTAL OGDEN MOUNTAIN RESOURCE VALUE |
|---|---|---|---|
| GOLD | 4.37 OZ / TON | $1,901.30 / OZ | $1.3972044 x 10E10 |
| SILVER | 0.139 OZ / TON | $24.580 / OZ | $5,745,456.00 |
| CHROMIUM | 4.46 OZ / TON | $0.28 / OZ (3.42/lb) | $2,100,007.00 |
| NICKEL | 1.02 OZ / TON | $0.58 / OZ ($7.09/lb) | $994,846.00 |
| TITANIUM | 84.2 OZ / TON | $0.21/ OZ ($2.52/lb) | $29,734,405.00 |
| VANADIUM | 5.14 OZ / TON | $0.064 / OZ (0.77lb) | $518,611.61 |
| TUNGSTEN | 1.49 OZ / TON | $1.36/ OZ ($2.75/kg | $3,407,634.80 |
| TOTAL RESOURCE VALUE | | | $14,014,545,000.00 |

**DISCLAIMER**

I, Dave A. Cockrum certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with the parameters and stipulations supplied by the client, and with a system designed to assure that qualified personnel properly gathered and evaluated the information submitted.  Based on my inquiry of the person or persons directly responsible for gathering the information and completing the work, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

_____ DAC 10-25-2020 _____

Dave A. Cockrum, Registered Professional Geologist, NI 43-101 Responsible Party

I, David A. Cockrum Registered Professional Geologist certify the following:

1.  I am a Registered Professional Geologist in the State of Idaho, with Bachelor's and Master's degrees in geology.

2.  I have work as a geologist for 38 years beginning in 1982.

3.  I have read the definition of "qualified person" set out in National Instrument 43-101 and certify that by reason of my education, affiliation with a professional organization, and past relevant work experience, I fulfill the requirements to be a "qualified person" for the purposes of NI 43-101.

4.  I am responsible for the preparation of the technical report entitled Ogden Mountain Placer Deposit Preliminary Report relating to the Ogden Mountain property.  I have personally visited the property on 3 occasions between 2009 and 2010.

5.  I have not had prior involvement with the subject property that is the subject of the NI 43-101 Report.

6.  As of the date of signature, to the best of my knowledge, information and belief, the NI 43-101 Report contains all available scientific and technical information that is required to be disclosed to make the NI 43-101 not be misleading.

7.  I am independent of the issuer applying all of the tests in section 1.4 of NI 43-101.

8.  I have read NI 43-101 and Form 43-101F1, and the report has been prepared in compliance with that instrument and form.

_____ DAC 10-25-2020 _____

Dave A. Cockrum, Registered Professional Geologist, NI 43-101 Responsible Party

OPERATING AGREEMENT

FOR

OMM DEVELOPMENT CO. LLC

THIS OPERATING AGREEMENT is made this 5th day of October, by and among GORDON JONES, an individual, VICKI JONES, an individual,

who hereafter shall be admitted to the Montana limited liability company of OMM DEVELOPMENT CO. LLC as a member (collectively the "members" and individually a member").

The members desire to form a limited liability company pursuant to the laws of the State of Montana. Accordingly, in consideration of the mutual covenants contained in this agreement, they agree as follows:

ARTICLE 1

THE LIMITED LIABILITY COMPANY

1.1     Formation. The members hereby agree to fowl a limited liability company (the "Company") pursuant to the provisions of the Montana Limited Liability Company Act (the "Act") and the provisions of this agreement.

1.2     Articles of Organization. The manager has executed and filed the Articles of Organization for the Company on October 5, 2011, and thereafter on October 11, 2011, filed Articles of Amendment to the LLC adding Members thereto, all of which have been filed in the office of the Secretary of State, and the members or the manager, as is applicable, shall execute such further documents (including amendments to the Articles of Organization) and take such further actions as shall be appropriate to comply with the requirements of law for the follnation or operation of a limited liability company in all states and counties where the Company may conduct its business.

1.3     Name. The name of the Company shall be OMM Development Co. LLC.

1.4     Registered Office, Registered Agent. The location of the registered office of the Company shall be 02000 Ogden Mt. Road (Post Office Box 853), Lincoln, Montana 59639 and thereafter at such other location as the members may designate. The Company's registered agent at such address shall be Gordon Jones.

1.5     Events of Dissolution. The Company shall continue in perpetuity, unless dissolved by:

(a)     the written consent of all members;

(b)     an event of dissociation of a member under the Act;

(c)     any event which makes it unlawful for the business of the Company to be carried on by the members; or

(d)     any other event causing a dissolution of a limited liability company under the Act.

1.6     Continuance of the Company. Notwithstanding the foregoing provisions of Article 1.5, upon the occurrence of an event described in Article 1.5(b), if there are at least two remaining members, the remaining members have the right to continue the business of the Company. Such right can be exercised only by the affirmative vote of a majority of the remaining members, as determined by their Sharing Ratios set forth in Article 3.1, within 90 days after the occurrence of an event described in Article 1.5(b), to continue the business of the Company. If not so exercised, the right of the members to continue the business of the Company shall expire and the Company's affairs shall be wound up as provided in Article 8.

1.7     Management of Business. Management of the business and affairs of the Company shall be vested in a single manager: GORDON JONES, who shall have the sole right and authority to manage the affairs of the Company and to make all decisions with respect to such management. The manager shall serve until or unless the personal physician of the manager shall state in writing that, in his or her opinion, such manager is physically or mentally incapacitated to such an extent that the manager is unable to give prompt and intelligent attention to the Company's affairs, and the manager shall be deemed to have resigned effective upon the filing in the Company's records of the physician's statement, whether or not the manager may have been adjudicated or certified an incompetent person. Each individual by accepting the office of manager, thereby agrees to cooperate in any medical examination necessary to implement this Article 1.7, waives the patient-physician privilege and consents to the disclosure of the manager's medical records to the extent required to implement this Article 1.7, and agrees that the manager's obligation to comply with this Article 1.7 is specifically enforceable. The manager otherwise cannot be removed by the members as long as he or she is a member. In the event of the termination of member GORDON JONES as the manager, the manager's responsibilities pursuant to this Article 1.7 shall vest automatically in member VICKI JONES who shall be the successor manager to member GORDON JONES .

1.8     Membership Voting Rights. Except as otherwise required by this Operating Agreement which will take precedent or, if required by the laws of the state of Montana, each member shall vote on any matter submitted to the membership for approval in

OPERATING AGREEMENT - 2

proportion to the members' percentage interest in the LLC as defined under Article 2, and specifically, Article 2.1, Initial Contributions, unless defined otherwise for a particular provision in this Operating Agreement. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, ALL MEMBERS, BY EXECUTING THIS OPERATING AGREEMENT, AGREE THAT ALL MATTERS, ISSUES AND DECISIONS PERTAINING TO ANY ACTION BY THE COMPANY SHALL BE DETERMINED BY MANAGING MEMBER GORDON _TONES IN HIS SOLE DISCRETION.. A vote of the majority members will be necessary to approve any issue which is capable of being voted on be members brought to vote unless a greater majority is required by other provisions of the Operating Agreement. The phrase "majority members" means the vote of members whose combined votes equal more than fifty percent (50%) of the votes of all members in the LLC as determined by their respective percentage interest in the Company.

   1.9 Character of Business. The business of the Company shall be to transact any and all businesses for which limited liability companies maybe formed under Montana law.

   1.10 Principal Place of Business. The location of the principal place of business of the Company shall be at 02000 Ogden Mt. Road, Lincoln, Montana 59639, or at such other place as the members from time to time may select.

   1.11 The Members. The name and place of residence of each member are as follows:

| Name | Address |
| --- | --- |
| GORDON JONES and VICKI JONES | 8840 West River Beach Lane Boise, Idaho 83714 |

## AR1 ICLE 2

## CAPITAL CONTRIBUTIONS

   2.1 Initial Contributions. The members initially shall contribute to the Company's capital the property described on Schedule A attached to this agreement and incorporated by this reference. The agreed value of such property as of the date of contribution is

OPERATING AGREEMENT - 3

2.2    <u>Initial Interests in Capital.</u> The interests of the members in the capital originally contributed to the Company are as follows:

| Name | Interests in Capital |
|------|---------------------|
| Gordon Jones | percent () |
| Vicki Jones | percent () |

2.3    <u>Additional Contributions.</u> Except as provided in this Article 2.3 and in Article 6.2, no member shall be obligated to make any additional contribution to the Company's capital. At any time, the members, by unanimous consent, may agree to the contribution of additional capital by one or more of the members. The value of each member's additional capital contribution shall be determined by unanimous agreement of the members at the time such consent is given. Additional capital contributions made under this Article 2.3 need not be made by the members in accordance with their Sharing Ratios.

2.4    <u>Liability of Members.</u> The liability of any member to make contribution shall be limited to the amount of the total contribution to be made pursuant to this Article 2 and Article 6.2. The members shall have no further liability to contribute money to the Company for, or in respect of, the liabilities or obligations of the Company, and the members shall not be personally liable for any obligations of the Company.

## ARTICLE 3

### INCOME, LOSSES AND DISTRIBUTIONS

3.1    <u>Income and Losses.</u> The Company's net income or net losses shall be determined on an annual basis and shall be allocated to the members in proportion to their Sharing Ratios. The "Sharing Ratio," of each member is set forth below opposite the member's name:

| Name | Sharing Ratio |
|------|--------------|
| Gordon Jones | 50% |
| Vicki Jones | 50% |

OPERATING AGREEMENT - 4

3,2    <u>Distributions.</u> Annually or at more frequent intervals, available funds shall be distributed to the members, in proportion to their Sharing Ratios. "Available funds" for this purpose means the Company's gross cash receipts, less the Company's expenditures, and less the amount that, in the members' reasonable judgment, the Company should retain in order to fulfill its business purposes.

## ARTICLE 4

## MANAGEMENT

4.1    <u>Members.</u> The liability of the members shall be limited as provided in the Act, regardless of their management of the Company. The members, other than member GORDON JONES, shall take no part whatever in the control, management, direction or operation of the Company's affairs and shall have no power to bind the Company. The manager may, from time to time, seek advice from the members on major policy decisions, but the manager need not accept such advice, and at all times the manager shall have the exclusive right to control and manage the Company as set forth herein and as set forth in Article 1.7 and 4.2, and in any other provision of this Operating Agreement.

4.2    <u>Powers of Manager.</u> The manager is authorized on the Company's behalf to make all decisions as to (a) the development, sale, lease or other disposition of the Company's assets; (b) the purchase or other acquisition of other assets of all kinds; (c) the management of all or any part of the Company's assets; (d) the borrowing of money and the granting of security interests in the Company's assets (including loans from members); (e) the prepayment, refinancing or extension of any mortgage affecting the Company's assets; (I) the compromise or release of any of the Company's claims or debts; and (g) the employment of persons, firms or corporations for the operation and management of the Company's business. In the exercise of the management powers, the manager is authorized to execute and deliver (a) all contracts, conveyances, assignments, leases, subleases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets; (b) all checks, drafts and other orders for the payment of the Company's funds; (c) all promissory notes, mortgages, deeds of trust, security agreements and other similar documents; and (d) all other instruments of any kind or character relating to the Company's affairs, whether like or unlike the foregoing.

4.3    <u>Nominee.</u> Title to the Company's assets shall be held in the Company's name or in the name of any nominee that the manager may designate, including the manager. The manager shall have power to enter into a nominee agreement with any such person, and such agreement may contain provisions indemnifying the nominee, except for the nominee's willful misconduct.

4.4    <u>Time Devoted to Business.</u> The manager shall devote such time to the business of the Company as the manager in his or her discretion deems necessary for the efficient operation of the Company's business. The manager shall at all times be free to engage for his or her own account in all aspects of any business or investment in which the Company is involved.

4.5    <u>Information Relating to Company.</u> Each member or an authorized representative shall have access to and may inspect and copy all books, records and materials regarding the Company or its activities. The exercise of the rights contained in this Article 4.5 shall be at the requesting member's expense.

4.6    <u>Exculpation.</u> Any act or omission of the manager, the effect of which may cause or result in loss or damage to the company or the members if done in good faith to promote the best interests of the Company, shall not subject the manager to any liability to the members.

4.7    <u>Records at Principal Place of Business.</u> The manager shall cause the Company to keep at its principal place of business the following:

(e)    a current and a past list in alphabetical order of the full name and last known mailing address of each member;

(f)    a copy of the stamped Articles of Organization and all amendments to them, together with executed copies of any powers of attorney pursuant to which any articles of amendment have been executed;

(g)    copies of the Company's federal, state and local income tax returns and financial statements, if any, for the three (3) most recent years or, if those returns and statements were not prepared for any reason, copies of the information and statements provided to, or which should have been provided to, the members to enable them to prepare their federal, state and local tax returns for the period;

(h)    copies of any effective written operating agreements, and all amendments to such agreements, and copies of any written operating agreements no longer in effect; and

(i)    other writings prepared pursuant to a requirement, if any, in this agreement, as amended from time to time.

OPERATING AGREEMENT - 6

## ARTICLE 5

## COMPENSATION

5.1     <u>Management Fee.</u> Any manager rendering services to the Company shall be entitled to compensation commensurate with the value of such services, which compensation shall be considered an expense of the Company and not a distribution of available funds pursuant to Article 3.2, if the manager also is a member.

5.2     <u>Reimbursement of Manager.</u> The Company shall reimburse the manager for all direct out-of-pocket expenses incurred in managing the Company.

## ARTICLE 6

## ACCOUNTS

6.1     <u>Books.</u> The manager shall maintain complete and accurate books of account of the Company's affairs at the Company's principal place of business. Such books shall be kept on such method of accounting as the manager shall select. The Company's accounting period shall be the calendar year.

6.2     <u>Member's Accounts.</u> The Company shall maintain separate capital and distribution accounts for each member. Each member's capital account shall consist of the member's initial capital contribution increased by (a) any additional capital contributions made by the member, and (b) credit balances transferred from the member's distribution account to the member's capital account, and decreased by (a) distributions to the member in reduction of Company capital, and (b) the member's share of Company losses, if charged to the members' capital accounts. The Company shall (a) maintain the capital accounts of the members at all times in proportion to their Sharing Ratios; (b) charge all distributions to the members' distribution accounts; (c) charge the Company's losses to the members' distribution accounts, unless the members determine to charge any such loss to the members' capital accounts; and (d) credit the Company's net income to the members' distribution accounts. The Company may transfer to the members, capital accounts all or anyportion of the credit balances in the members' distribution accounts. Any amounts transferred shall be in proportion to the members' Sharing Ratios. A credit balance in a member's distribution account shall constitute a liability of the Company to that member; it shall not constitute a part of that member's interest in the Company's capital. A debit balance in a member's distribution account, whether occasioned by distributions in excess of the member's share of Company income or by charging the member for his or her share of Company loss, shall constitute an obligation of that member to the Company, it shall not reduce the member's interest in the Company's capital. Payment of any amount owed to the Company shall be made at such time and in such manner as the manager may determine.

6.3    Transfers During Year. To avoid an interim closing of the Company's books, the share of income and losses under Article 3 of a member who transferred part or all of the member's interest in the Company during the calendar year shall be determined by taking the member's proportionate share of the amount of the income and losses for the year. The manager shall make the proration based on the portion of the calendar year that has elapsed prior to the transfer. The manager shall allocate the balance of the income and losses attributable to the transferred interest to the transferee of such interest.

6.4    Income Tax liability. If the Company may be liable for the payment of any tax as a result of a member's failure to file a tax return or to pay a tax liability, the non-filing member shall be liable personally to the Company for any such tax, plus penalties and interest. The Company may pay such liability out of funds in the non-filing member's capital or distribution accounts.

6.5    Reports. The manager shall close the books of account promptly after the close of each calendar year, and shall prepare and send to each member a statement of such member's distributive share of income and expense for federal income tax reporting purposes.

ARTICLE 7

TRANSFERS

7.1    Assignment.

(a)    A member may transfer all or any part of his or her interest in the Company outright to or in trust for the benefit of any member of a member's immediate family. As used in this agreement, the term "immediate family" includes the member's spouse, children, grandchildren, father and mother, and may include other family members only if transfers to such other family members will not terminate the Company pursuant to Section 708(b)(1)(B) of the Internal Revenue Code of 1986, as amended, or as equivalent replacement provisions of federal tax statutes.

(b)    Except as provided in Article 7.1(a), at any time a member proposes to sell, assign or otherwise dispose of all or any part of the member's interest in the Company, such member (the "selling member") shall first make a written offer to sell such interest to the other members at a price that is the lesser of (1) any price offered by a third party, or (2) the price determined as provided in Article 7.1(c) and on the terms and conditions set forth in Article 7.1(d). Such offer shall state the name of the proposed transferee and all the terms and conditions of the proposed transfer, including the price to the proposed transferee. The other members shall have the right for a period of 30 days after receipt of such offer to elect to purchase all of such interest. In exercising their right to purchase, the other members may divide such interest in any manner to which they shall all agree, and not all of them must participate in the purchase. In the absence of such agreement, the other members shall divide such interest in

OPERATING A GREEM ENT - 8

proportion to their Sharing Ratios as of the time the offer is made. To exercise such right to purchase, the other members shall give written notice to the selling member. If the other members do not elect to purchase all of such interest, the selling member may transfer such interest to the proposed transferee named in the offer to the other members. However, if the selling member does not complete that transfer within 90 days after the other members' right to purchase has terminated, the selling member shall make a new offer to the other members and the provisions of Article 7.1(b) again shall apply.

(c)     The alternative purchase price for the selling member's interest under Article 7.1(b) shall be determined as follows:

(1)     The value of the Company's real property shall be the fair market value of such property as determined by agreement between the selling member and the purchasing members. If the selling member and purchasing members are unable to agree as to the fair market value, the members shall appoint a qualified appraiser to determine the fair market value of such property, and such appraiser's deter     ttination shall be final, conclusive and binding upon the parties.

(2)     The value of the Company's marketable securities shall be their fair market value as evidenced by the trading in such securities on any stock exchange or over-the-counter market.

(3)     The value of the Company's cash shall be its full face value.

(4)     The value of the Company's accounts receivable shall be their full face value less such amount as the members deem appropriate to reflect the possibility of nonpayment

(5)     The value of all other assets shall be their fair market value as the members shall determine.

(6)     The aggregate value of the Company's assets as determined above shall be reduced by the face amount of the aggregate amount of the Company's accounts payable and other liabilities.

(7)     The purchase price of the selling member's interest shall be the portion of the total value of the Company as determined under (1) through (6) above that is attributable to the selling member's interest in the Company.

(d)     The purchasing members shall pay for the selling member's interest in cash within 30 days after notifying the selling member of the exercise of their right to purchase such interest.

OPERATING A GREEM ENT - 9

7.2    <u>Death or Incompetency.</u> If a member dies, such person or entity as the member may have designated by written instrument signed by the member and delivered to the Company before or after the member's death or, if the member has made no such designation, the member's personal representative or administrator shall succeed to the member's interest in the profit or loss and capital of the Company. If a member shall be adjudicated insane, incompetent or incapacitated, the member's committee, guardian or conservator shall succeed to such interest.

7.3    <u>Substitution of Transferee as Member.</u>

(a)    Subject to the provisions of Article 7.1, a member may sell, assign or otherwise dispose of all or any part of the member's interest in the Company.

(b)    No transferee, designee or legal representative of a member, including a transferee by operation of law or pursuant to Article 7.1(a), shall become a substitute member without the consent of a majority of the remaining members, as determined by their Sharing Ratios set forth in Article 3.1. As conditions to admission as a substitute member (1) any transferee, designee or legal representative of the member shall execute and deliver such instruments, in form and substance satisfactory to the members, as the members shall deem necessary or desirable to cause the transferee to become a substitute member, and (2) such transferee, designee or legal representative shall pay all reasonable expenses in connection with the member's admission as a substitute member, including but not limited to, the cost of preparation and filing of any amendment of this agreement or the Certificate of Organization necessary or desirable in connection with such substitution.

(c)    In the event that such a consent is not granted, the transferee has no right to participate in the management of the business and affairs of the Company, which rights shall remain in the transferring member. The transferee is entitled only to receive the share of distributions of available cash and liquidation proceeds and the return of contributions to which the transferring member otherwise would be entitled, and shall receive the allocation of the Company's net income or net losses that otherwise would be allocated to the transferring member.

ARTICLE 8

DISSOLUTION AND TERMINATION

8.1    <u>Final Accounting.</u> In case of the Company's dissolution, a proper accounting shall be made from the date of the last previous accounting to the date of dissolution.

8.2    <u>Liquidation.</u> Upon the Company's dissolution and the failure of the remaining members to continue the Company as provided in Article 1.6, the manager or some person selectedby a majority of the members, as determined by their Sharing Ratios set forth in Article 3.1, shall act as liquidator to wind up the Company. The liquidator shall have full power

and authority to sell, assign and encumber any or all of the Company's assets and to wind up and liquidate the Company's affairs in an orderly and prudent manner. The liquidator shall distribute all proceeds from liquidation to the members in proportion to their Sharing Ratios.

8.3     Distribution in Kind. If the liquidator shall determine that a portion of the Company's assets should be distributed in kind to the members, the liquidator shall distribute such assets to them in undivided interests as tenants in common in proportion to their Sharing Ratios.

8.4     Cancellation of Certificate. Upon the completion of the distribution of Company assets, the Company shall be terminated and the members shall cause the Company to execute Articles of Dissolution and take such other actions as may be necessary to terminate the Company.

## ARTICLE 9

## AMENDMENT TO AGREEMENT

Any amendment to this agreement and to the Articles of Organization shall become effective only at such time as it has been approved in writing by all members.

## ARTICLE 10

## NOTICES

10.1 Method for Notices. All notices under this Agreement shall be sent by first class mail, postage prepaid, and addressed as set forth in Article 1.10 above (except that any member may from time to time give notice changing the member's address for such purpose) and shall be effective on the date of receipt or on the fifth day after mailing, whichever is earlier.

10.2 Computation of Time. In computing any period of time under this agreement, the day of the *act,* event or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

## ARTICLE II

## DISPUTE RESOLUTION

11.1 Alternate Dispute Resolution. In the event that a dispute arises among the members or between the members and the manager regarding this agreement or any matter related to the conduct or operation of the business and affairs of the Company, the parties shall resolve such dispute without litigation, utilizing alternate dispute resolution procedures.

OPERATING AGREEMENT - II

11.2 Mediation. The parties first shall attempt to mediate the dispute through the selection of a mutually agreeable mediator who shall conduct such mediation in confidence.

11.3 Arbitration. If such mediation is unsuccessful, since mediation is not binding on the members unless they agree in the course of such mediation, the members then shall submit the dispute to binding arbitration pursuant to the Montana Uniform Arbitration Act (the "Arbitration Act") and the Commercial Arbitration Rules of the American Arbitration Association then in effect, to the extent that those rules are not inconsistent with the Arbitration Act. Such arbitration shall be conducted before a single arbitrator, chosen from the panel of arbitrators available for such proceedings. The award of the arbitrator shall be final, subject only to the relief available under the Arbitration Act. Excepting as the award of the arbitrator otherwise may provide, the members shall share equally the expenses, including the fees of the mediator and/or arbitrator, and each member shall bear the member's respective attorneys' fees and related costs.

## ARTICLE 12

## GENERAL PROVISIONS

12.1 Entire Agreement. This agreement (a) contains the entire agreement among the parties, (b) shall be construed in accordance with, and governed by, the laws of the State of Montana, and (c) shall be binding upon and shall inure to the benefit of the parties and their respective personal representatives, successors and assigns, except as set forth above.

13.2 Construction Principles. Words in any gender shall be deemed to include the other genders. The singular shall be deemed to include the plural and vice versa. The headings and underlined paragraph titles are for guidance only and shall have no significance in the interpretation of this agreement.

IN WITNESS WHEREOF, the members have signed this Operating Agreement on the respective dates set forth below to be effective as of the date first above written.

MEMBERS:

Date: _____

Gordon Jones, individual
Address: 8840 W. River Beach Lane
City/State/Zip: Boise, Idaho 83714
Telephone: 208/323-9449
Social Security #_____

Date: _____        _____
                             Vicki Jones, individual
                             Address: 8840 W. River Beach Lane
                             City/State/Zip: Boise, Idaho 83714
                             Telephone: 208/323-9449
                             Social Security # _____

Date: _____        _____

                             Address: _____
                             City/State/Zip: _____
                             Telephone: _____
                             Social Security # _____

Date: _____        _____

                             Address: _____
                             City/State/Zip: _____
                             Telephone: _____
                             Social Security # _____

Date: _____        _____

                             Address: _____
                             City/State/Zip: _____
                             Telephone: _____
                             Social Security # _____

CONSENTED TO:

Dated: _____        _____

OPERATING AGREEMENT - 13

SCHEDULE A

(Attached to and Forming a Part of
Operating Agreement
For
OMIM Development Co., LLC
dated as of
October 5th, 2011

| Member | Contribution | Agreed Value |
|--------|--------------|--------------|
| Gordon Jones | | |
| Vicki Jones | | |

OPERATING AGREEMENT - 14

DocuSign Envelope ID: 7CE1276B-DB07-4070-8555-D96FD9C39073



Investment Funding Group
"funding your investment dreams"

## Letter of Interest to Fund

11/19/20

OMM Development CO, LLC
Gordon Jones
8840 W River Beach Ln
Boise, ID  83714

Re: Ogden Mountain Placer Reserve, legal to follow

Dear Mr. Gordon,

Outlined below are the general terms and conditions required by 4U Global Marketing & Finance. These terms are not final and additional conditions may be requested.  This letter is not a commitment to fund until all conditions have been meet and satisfied.

This Letter of Intent shall expire on **11/20/20** with closing on or before 45 days from satisfied conditions.

TERMS:          loan # 020-111299

1.  4U Global Marketing & Finance is prepared to issue or cause to issue a loan in the amount stated below.  The terms and conditions are presented herein.

2.  The loan terms will be as follows:
    a.  Loan amount = $35,000,000
    b.  Bankruptcy of Gordon Jones to be paid in full and released or proven cannot be attached to property.
    c.  Due Diligence fee of $10,000 to cover expenses(see wire instructions below).  Fee is refundable if loan is not completed minus any hard expenses.
    d.  Attorney information handling bankruptcy and payoff.
    e.  4U Global Marketing & Finance to be first trust deed only.
    f.  Interest Rate = 6.99% for one year.  Interest is calculated on a daily basis and paid monthly from the reserve set up from loan proceeds.
    g.  Interest reserve of 12 months from proceeds to be used on monthly basis to make payment.  If loan is paid off in full any remaining reserve balance will be applied to the principle balance.
    h.  Term = 12 months with one 12 month extension
    i.  Site inspection by principle or other party.
    j.  Full evaluation of 43-101 to confirm estimated total land value.
    k.  Explanation letter of bankruptcy.
    l.  Interest due monthly on outstanding balance of loan.
    m.  Pre Payment Penalty = none
    n.  Personal Guarantee = None
    o.  ·Full title insurance with lender policy to 4U Global Marketing & Finance.
    p.  Closing protection letter.

3.  In lieu of equity, a total Origination Fee of Five Percent (5%) of the loan amount will be paid at closing.

4.  This loan must close pursuant to 4U Global Marketing & Finance closing procedures as explained in the final commitment.

5.  Due Diligence fee to be wired to:
    Austin
    Spokane Teachers Credit Union
    207 N Wall St Spokane WA 99201
    Routing # ███████
    Account # -█████9347

6.  Not withstanding anything to the contrary contained herein, in no event shall the interest rate contracted for, charged, or received exceed the maximum rate allowed by law.

Sincerely,

*Robert Austin*

By: Robert Austin
Title: Owner Investment Funding Group

By: Eugene Uhryniuk
Title: President 4U Global Marketing & Finance
160-200 Alpine Way Headingley MB Canada

I hereby acknowledge and agree to the above terms.

┌─DocuSigned by:
*Gordon Jones*
└─080F4656545B467...

By:     Gordon Jones – managing member
        OMM Development CO, LLC

Investment Funding Group, LLC  6712 S Baymont Ct Spokane WA 99224

175125  Fee: $14.00  Bk 132 DEED  Pg 541
POWELL COUNTY  Recorded 3/14/2017  At 3:00 PM
JODY WALKER, Clk & Rcdr By _____
Return To: GORDON JONES  8840 W RIVER BENCH LN
GARDEN CITY ID 83714

Return Recorded Document to:
Gordon Jones

*8840 West River Bench*
*Lane, Garden City.*
*ID 83714*

## WARRANTY DEED

For Value Received, **GORDON JONES and VICKI JONES**

the Grantors, do hereby grant, bargain, sell and convey unto

**OMM DEVELOPMENT CO. LLC** whose mailing address is PO Box 853, Lincoln, MT  59639,

the Grantee, successors and assigns forever, the following described premises in Powell County, Montana, to-wit:

LANDS LYING IN TOWNSHIP 13 NORTH, RANGE 10 WEST, P.M.M.:
Section 15:   Grouse Placer embracing S½SW¼SW¼ & SE¼SW¼
Magpie Placer embracing SW¼NW¼SE¼, SW¼SE¼ & NW¼SE¼SE¼
Section 16:   Bluebird Placer embracing N½SW¼SE¼, S½SE¼SE¼, SE¼SW¼SE¼
Section 22:   Meadow Lark Placer embracing NW¼NE¼
Blackbird Placer embracing N½NW¼, N½SW¼NW¼, W½SE¼NW¼, SE¼SW¼NW¼

Subject to an underlying Contract for Deed between A-Snap, Inc., and Northporte Land, LLC, as Seller, and Gordon Jones and Vicki Jones, as Buyer, dated October 29, 2008, recorded December 3, 2008, in Book 119, page 383, Deed records.

TO HAVE AND TO HOLD the said premises, with their appurtenances unto the said Grantee and to his heirs and assigns forever.  And the said Grantor does hereby covenant to and with the said Grantee, that he is a owner in fee simple of said premises; that he is free from all incumbrances except taxes for current and subsequent years and covenants, conditions, restrictions and easements apparent and/or of record and that he will warrant and defend the same from all lawful claims whatsoever.

Dated this _____21st_____ day of May, 2012.

175125  Fee: $14.00  Bk 132 DEED  Pg 542
POWELL COUNTY   Recorded 3/14/2017  At 3:00 PM

Gordon Jones

Vicki Jones

STATE OF MONTANA )
                 :
COUNTY OF POWELL )

This instrument was acknowledged before me on this _____7th_____ day of May,
2012, by Gordon Jones.

GRACE FOSTER
NOTARY PUBLIC for the
State of Montana
Residing at Deer Lodge, Montana
My Commission Expires
June 15, 2014

_Grace Foster_
(Signature of Notary Public)
Print Name: _GRACE FOSTER_
Notary Public for the State of Montana
Residing at _DEER LODGE, MT_
My commission expires _JUNE 15_ 20_14_

STATE OF IDAHO        )
                      :
COUNTY OF _Ada_       )

This instrument was acknowledged before me on this ____21st____ day of May,
2012, by Vicki Jones.

_B. Wilfong_
(Signature of Notary Public)
Print Name: _Brad Wilfong_
Notary Public for the State of Idaho
Residing at _5312 Chinden Blvd, Boise, ID 83714_
My commission expires _4-27-2015_ 20_15_

BRAD WILFONG
Notary Public
State of Idaho

March 9, 2017
76F 97781-00

### STATE OF MONTANA
### DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION
1424 9TH AVENUE  P.O.BOX 201601  HELENA, MONTANA 59620-1601

# GENERAL ABSTRACT

**Water Right Number:**  76F 97781-00  STATEMENT OF CLAIM

Version:  2 -- POST DECREE

Version Status: ACTIVE

**Owners:**  GORDON JONES
PO BOX 8492
BOISE, ID 83707-8492

VICKI JONES
PO BOX 8492
BOISE, ID 83707-8492

**Priority Date:**  NOVEMBER 5, 1964

**Enforceable Priority Date:**  NOVEMBER 5, 1964

**Type of Historical Right:**  USE

**Purpose (use):**  MINING

**Maximum Flow Rate:**  2.50 CFS

**Maximum Volume:**  THIS RIGHT IS LIMITED TO THE VOLUME OF WATER HISTORICALLY USED FOR MINING PURPOSES.

**Source Name:**  WILSON CREEK

**Source Type:**  SURFACE WATER

**Point of Diversion and Means of Diversion:**

| ID | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|----------|---------|-----|-----|-----|--------|
| 1  |          | NENWNW  | 22  | 13N | 10W | POWELL |

**Period of Diversion:** APRIL 1 TO NOVEMBER 1

**Diversion Means:**  HEADGATE

**Period of Use:**  APRIL 1 to NOVEMBER 1

**Place of Use:**

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|-------|----------|---------|-----|-----|-----|--------|
| 1  |       |          | NENWNW  | 22  | 13N | 10W | POWELL |

**Geocodes/Valid:**  28-2209-22-2-01-01-MINE - Y

---

Remarks:

THE WATER RIGHTS LISTED FOLLOWING THIS STATEMENT ARE MULTIPLE USES OF THE SAME RIGHT. THE USE OF THIS RIGHT FOR SEVERAL PURPOSES DOES NOT INCREASE THE EXTENT OF THE WATER RIGHT. RATHER IT DECREES THE RIGHT TO ALTERNATE AND EXCHANGE THE USE (PURPOSE) OF THE WATER IN ACCORD WITH HISTORICAL PRACTICES.

97781-00      97784-00      97786-00

THE FOLLOWING ELEMENTS WERE AMENDED BY THE CLAIMANT ON 08/18/2006: PURPOSE, VOLUME.

STARTING IN 2008, PERIOD OF DIVERSION WAS ADDED TO MOST CLAIM ABSTRACTS, INCLUDING THIS ONE.

NOTICE OF WATER RIGHT TRANSFER RECEIVED 03/25/96.

**OWNERSHIP UPDATE RECEIVED**

OWNERSHIP UPDATE TYPE 608 # 12853 RECEIVED 02/09/2004.

OWNERSHIP UPDATE TYPE DOR # 78300 RECEIVED 10/29/2008.

March 9, 2017
76F 97782-00

Page 2 of 6
General Abstract

### STATE OF MONTANA
DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION
1424 9TH AVENUE  P.O. BOX 201601  HELENA, MONTANA 59620-1601

# GENERAL ABSTRACT

**Water Right Number:**    76F 97782-00    STATEMENT OF CLAIM

Version:    2 -- POST DECREE

Version Status: ACTIVE

**Owners:**
GORDON  JONES
PO BOX 8492
BOISE, ID 83707-8492

VICKI JONES
PO BOX 8492
BOISE, ID 83707-8492

**Priority Date:**    NOVEMBER 5, 1964

**Enforceable Priority Date:**    NOVEMBER 5, 1964

**Type of Historical Right:**  USE

**Purpose (use):**    MINING

**Maximum Flow Rate:**    2.35 CFS

**Maximum Volume:**    THIS RIGHT IS LIMITED TO THE VOLUME OF WATER HISTORICALLY USED FOR MINING PURPOSES.

**Source Name:**    UNNAMED TRIBUTARY OF WILSON CREEK

**Source Type:**    SURFACE WATER

ALSO KNOWN AS NORTH WILSON CREEK

**Point of Diversion and Means of Diversion:**

| ID | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|----------|---------|-----|-----|-----|--------|
| 1  |          | SWSESW  | 15  | 13N | 10W | POWELL |

**Period of Diversion:** APRIL 1 TO NOVEMBER 1
**Diversion Means:**  HEADGATE

**Period of Use:**    APRIL 1 to NOVEMBER 1

**Place of Use:**

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|-------|----------|---------|-----|-----|-----|--------|
| 1  |       |          | SWSESW  | 15  | 13N | 10W | POWELL |

**Geocodes/Valid:**    28-2209-15-3-01-01-MINE - Y

**Remarks:**

THE FOLLOWING ELEMENTS WERE AMENDED BY THE CLAIMANT ON 08/18/2006: PURPOSE, VOLUME.

STARTING IN 2008, PERIOD OF DIVERSION WAS ADDED TO MOST CLAIM ABSTRACTS, INCLUDING THIS ONE.

NOTICE OF WATER RIGHT TRANSFER RECEIVED 03/25/96.

**OWNERSHIP UPDATE RECEIVED**

OWNERSHIP UPDATE TYPE 608 # 12853 RECEIVED 02/09/2004.

OWNERSHIP UPDATE TYPE DOR # 78300 RECEIVED 10/29/2008.

March 9, 2017
76F 97783-00

## STATE OF MONTANA

### DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION

1424 9TH AVENUE  P.O.BOX 201601  HELENA, MONTANA 59620-1601

# GENERAL ABSTRACT

**Water Right Number:**  76F 97783-00   STATEMENT OF CLAIM

Version:  2 -- POST DECREE

Version Status: ACTIVE

**Owners:**

GORDON JONES
PO BOX 8492
BOISE, ID 83707-8492

VICKI JONES
PO BOX 8492
BOISE, ID 83707-8492

**Priority Date:**  NOVEMBER 5, 1964

**Enforceable Priority Date:**  NOVEMBER 5, 1964

**Type of Historical Right:**  USE

**Purpose (use):**  MINING

**Maximum Flow Rate:**  2.25 CFS

**Maximum Volume:**  THIS RIGHT IS LIMITED TO THE VOLUME OF WATER HISTORICALLY USED FOR MINING PURPOSES.

**Source Name:**  UNNAMED TRIBUTARY OF WILSON CREEK

**Source Type:**  SURFACE WATER

ALSO KNOWN AS SOUTH WILSON CREEK

**Point of Diversion and Means of Diversion:**

| ID | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|----------|---------|-----|-----|-----|--------|
| 1  |          | NWNWNW  | 22  | 13N | 10W | POWELL |

**Period of Diversion:** APRIL 1 TO NOVEMBER 1

**Diversion Means:**  HEADGATE

**Period of Use:**  APRIL 1 to NOVEMBER 1

**Place of Use:**

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|-------|----------|---------|-----|-----|-----|--------|
| 1  |       |          | NWNWNW  | 22  | 13N | 10W | POWELL |

**Geocodes/Valid:**  28-2209-22-2-01-01-MINE - Y

**Remarks:**

THE FOLLOWING ELEMENTS WERE AMENDED BY THE CLAIMANT ON 08/18/2006: PURPOSE, VOLUME.

STARTING IN 2008, PERIOD OF DIVERSION WAS ADDED TO MOST CLAIM ABSTRACTS, INCLUDING THIS ONE.

NOTICE OF WATER RIGHT TRANSFER RECEIVED 03/25/96.

**OWNERSHIP UPDATE RECEIVED**

OWNERSHIP UPDATE TYPE 608 # 12853 RECEIVED 02/09/2004.

OWNERSHIP UPDATE TYPE DOR # 78300 RECEIVED 10/29/2008.

March 9, 2017
76F 97784-00

Page 4 of 6
General Abstract

STATE OF MONTANA

DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION

1424 9TH AVENUE  P.O.BOX 201601  HELENA, MONTANA 59620-1601

# GENERAL ABSTRACT

Water Right Number:    76F 97784-00   STATEMENT OF CLAIM
Version:  1 -- ORIGINAL RIGHT

Version Status: ACTIVE

Owners:
GORDON JONES
PO BOX 8492
BOISE, ID 83707-8492

VICKI JONES
PO BOX 8492
BOISE, ID 83707-8492

Priority Date:    NOVEMBER 5, 1964

Enforceable Priority Date:   NOVEMBER 5, 1964
Type of Historical Right:  USE

Purpose (use):    MULTIPLE DOMESTIC
Maximum Flow Rate:    30.00 GPM
Maximum Volume:    4.90 AC-FT

Households:    3

Maximum Acres:    5.00

Source Name:    WILSON CREEK

Source Type:    SURFACE WATER

Point of Diversion and Means of Diversion:

| ID | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|----------|---------|-----|-----|-----|--------|
| 1  |          | NENWNW  | 22  | 13N | 10W | POWELL |

Period of Diversion: JANUARY 1 TO DECEMBER 31
Diversion Means:  PUMP

Period of Use:    JANUARY 1 to DECEMBER 31

Place of Use:

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|-------|----------|---------|-----|-----|-----|--------|
| 1  | 5.00  |          | NENWNW  | 22  | 13N | 10W | POWELL |
| Total: | 5.00 |       |         |     |     |     |        |

Geocodes/Valid:    28-2209-22-2-01-01-MINE - Y

Remarks:

THE WATER RIGHTS LISTED FOLLOWING THIS STATEMENT ARE MULTIPLE USES OF THE SAME
RIGHT.  THE USE OF THIS RIGHT FOR SEVERAL PURPOSES DOES NOT INCREASE THE EXTENT OF
THE WATER RIGHT.  RATHER IT DECREES THE RIGHT TO ALTERNATE AND EXCHANGE THE USE
(PURPOSE) OF THE WATER IN ACCORD WITH HISTORICAL PRACTICES.

97781-00        97784-00        97785-00

STARTING IN 2008, PERIOD OF DIVERSION WAS ADDED TO MOST CLAIM ABSTRACTS, INCLUDING THIS
ONE.

NOTICE OF WATER RIGHT TRANSFER RECEIVED 03/25/96.

**OWNERSHIP UPDATE RECEIVED**

OWNERSHIP UPDATE TYPE 608 # 12853 RECEIVED 02/09/2004.

OWNERSHIP UPDATE TYPE DOR # 78300 RECEIVED 10/29/2008.

March 9, 2017
76F 97785-00

Page 5 of 6
General Abstract

STATE OF MONTANA
DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION
1424 9TH AVENUE  P.O.BOX 201601  HELENA, MONTANA 59620-1601

# GENERAL ABSTRACT

**Water Right Number:**    76F 97785-00    STATEMENT OF CLAIM

Version:    1 -- ORIGINAL RIGHT

Version Status: ACTIVE

**Owners:**

GORDON JONES
PO BOX 8492
BOISE, ID 83707-8492

VICKI JONES
PO BOX 8492
BOISE, ID 83707-8492

**Priority Date:**    NOVEMBER 5, 1964

**Enforceable Priority Date:**    NOVEMBER 5, 1964

**Type of Historical Right:** USE

**Purpose (use):**    STOCK

**Maximum Flow Rate:**    A SPECIFIC FLOW RATE HAS NOT BEEN DECREED BECAUSE THIS USE CONSISTS OF STOCK DRINKING DIRECTLY FROM THE SOURCE, OR FROM A DITCH SYSTEM.

**Maximum Volume:**    THIS RIGHT INCLUDES THE AMOUNT OF WATER CONSUMPTIVELY USED FOR STOCK WATERING PURPOSES AT THE RATE OF 30 GALLONS PER DAY PER ANIMAL UNIT. ANIMAL UNITS SHALL BE BASED ON REASONABLE CARRYING CAPACITY AND HISTORICAL USE OF THE AREA SERVICED BY THIS WATER SOURCE.

**Source Name:**    WILSON CREEK

**Source Type:**    SURFACE WATER

**Point of Diversion and Means of Diversion:**

| ID | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|----------|---------|-----|-----|-----|--------|
| 1  |          | NENWNW  | 22  | 13N | 10W | POWELL |

**Period of Diversion:** JANUARY 1 TO DECEMBER 31

**Diversion Means:**    LIVESTOCK DIRECT FROM SOURCE

**Period of Use:**    JANUARY 1 to DECEMBER 31

**Place of Use:**

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|-------|----------|---------|-----|-----|-----|--------|
| 1  |       |          | NENWNW  | 22  | 13N | 10W | POWELL |

**Geocodes/Valid:**    28-2209-22-2-01-01-MINE - Y

---

**Remarks:**

THE WATER RIGHTS LISTED FOLLOWING THIS STATEMENT ARE MULTIPLE USES OF THE SAME RIGHT. THE USE OF THIS RIGHT FOR SEVERAL PURPOSES DOES NOT INCREASE THE EXTENT OF THE WATER RIGHT. RATHER IT DECREES THE RIGHT TO ALTERNATE AND EXCHANGE THE USE (PURPOSE) OF THE WATER IN ACCORD WITH HISTORICAL PRACTICES.

97781-00    97784-00    97785-00

STARTING IN 2008, PERIOD OF DIVERSION WAS ADDED TO MOST CLAIM ABSTRACTS, INCLUDING THIS ONE.

NOTICE OF WATER RIGHT TRANSFER RECEIVED 03/25/86.

**OWNERSHIP UPDATE RECEIVED**

OWNERSHIP UPDATE TYPE 608 # 12853 RECEIVED 02/09/2004.

OWNERSHIP UPDATE TYPE DOR # 78300 RECEIVED 10/29/2008.

March 9, 2017
76F 30063437

### STATE OF MONTANA
DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION
1424 9TH AVENUE  P.O.BOX 201601  HELENA, MONTANA 59620-1601

# GENERAL ABSTRACT

**Water Right Number:**    76F 30063437    GROUND WATER CERTIFICATE

Version:  1 -- ORIGINAL RIGHT

Version Status: ACTIVE

**Owners:**
GORDON JONES
PO BOX 8492
BOISE, ID 83707-8492

VICKI JONES
PO BOX 8492
BOISE, ID 83707-8492

**Priority Date:**    JUNE 11, 2012 at 08:07 A.M.

Enforceable Priority Date:   JUNE 11, 2012 at 08:07 A.M.

**Purpose (use):**    DOMESTIC
STOCK

**Maximum Flow Rate:**    25.00 GPM

**Maximum Volume:**    1.30 AC-FT

**Source Name:**    GROUNDWATER

Source Type:    GROUNDWATER

**Point of Diversion and Means of Diversion:**

| ID | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|----------|---------|-----|-----|-----|--------|
| 1 |  | NWSESW | 15 | 13N | 10W | POWELL |

Period of Diversion: JANUARY 1 TO DECEMBER 31      Flow Rate: 25.00 GPM

Diversion Means:   DEVELOPED SPRING

**Purpose (Use):**    DOMESTIC

Households:    1

Volume:    1.00 AC-FT

Period of Use:    JANUARY 1 to DECEMBER 31

Place of Use:

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|-------|----------|---------|-----|-----|-----|--------|
| 1 |  |  | NENWNW | 22 | 13N | 10W | POWELL |

**Purpose (Use):**    STOCK

Volume:    0.30 AC-FT

Period of Use:    JANUARY 1 to DECEMBER 31

Place of Use:

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|-------|----------|---------|-----|-----|-----|--------|
| 1 |  |  | NENWNW | 22 | 13N | 10W | POWELL |

**Geocodes/Valid:**    26-2209-22-2-01-01-MINE - Y

# PROPERTY PROFILE

DATE:                          June 17, 2020

PREPARED FOR:           Kara Proctor

PREPARED BY:             Grace Foster
                              Powell County Title Co.
                              313 Missouri Ave.
                              Deer Lodge, MT 59722
                              Phone (406) 846-1270
                              Fax (406) 846-1825
                              Email: pctc@bresnan.net

LEGAL DESCRIPTION:

    SEE ATTACHED DEED.

ADDRESS (if of record):

LAST GRANTEE OF RECORD: OMM Development Co. LLC

MORTGAGE(S) OR DEED(S) OF TRUST IN FAVOR OF:

FOR:   Tax Information, Contact the Powell County Treasurer's Office at 406-846-9797.

FOR:   Powell County Planning Information, Contact the Deer Lodge County Planning Office at
      406-846-9795.

ATTACHMENTS:      (X)      Deed
                         ( )      Deed of Trust/Mortgage
                         (X)      Plat (Map)
                         ( )      Restrictions
                         (X)      Tax Query

This information is provided at no charge by Powell County Title Company to Realtors only in
anticipation of receiving an order on the above mentioned property**

175125  Fee: $14.00  Bk 132 DEED  Pg 541

POWELL COUNTY   Recorded 3/14/2017   At 3:00 PM
JODY WALKER, Clk & Rcdr By _Verita B Nichols_
Return To: GORDON JONES  8840 W RIVER BENCH LN
GARDEN CITY ID 83714

Return Recorded Document to:
Gordon Jones

_8840 West River Bench_
_Lane, Garden City._
_ID 83714_

### WARRANTY DEED

For Value Received, **GORDON JONES** and **VICKI JONES**

the Grantors, do hereby grant, bargain, sell and convey unto

**OMM DEVELOPMENT CO. LLC** whose mailing address is PO Box 853, Lincoln, MT  59639,

the Grantee, successors and assigns forever, the following described premises in Powell
County, Montana, to-wit:

LANDS LYING IN TOWNSHIP 13 NORTH, RANGE 10 WEST, P.M.M.:

Section 15:   Grouse Placer embracing S½SW¼SW¼ & SE¼SW¼
              Magpie Placer embracing SW¼NW¼SE¼, SW¼SE¼ & NW¼SE¼SE¼
Section 16:   Bluebird Placer embracing N½SW¼SE¼, S½SE¼SE¼, SE¼SW¼SE¼
Section 22:   Meadow Lark Placer embracing NW¼NE¼
              Blackbird Placer embracing N½NW¼, N½SW¼NW¼, W½SE¼NW¼,
              SE¼SW¼NW¼

Subject to an underlying Contract for Deed between A-Snap, Inc., and Northporte Land,
LLC, as Seller, and Gordon Jones and Vicki Jones, as Buyer, dated October 29, 2008,
recorded December 3, 2008, in Book 119, page 383, Deed records.

TO HAVE AND TO HOLD the said premises, with their appurtenances unto the said
Grantee and to his heirs and assigns forever.  And the said Grantor does hereby covenant to
and with the said Grantee, that he is a owner in fee simple of said premises; that he is free
from all incumbrances except taxes for current and subsequent years and covenants,
conditions, restrictions and easements apparent and/or of record and that he will warrant and
defend the same from all lawful claims whatsoever.

Dated this ___21ˢᵗ___ day of May, 2012.

175129   Fee: $14.00   Bk 132 DEED   Pg 542
POWELL COUNTY   Recorded 3/14/2017   At 3:00 PM

Gordon Jones

Vicki Jones

STATE OF MONTANA )
                 :
COUNTY OF POWELL )

This instrument was acknowledged before me on this _____7th_____ day of May,
2012, by Gordon Jones.

GRACE FOSTER
NOTARY PUBLIC for the
State of Montana
Residing at Deer Lodge, Montana
My Commission Expires
June 15, 2014

*Grace Foster*
(Signature of Notary Public)
Print Name: GRACE FOSTER
Notary Public for the State of Montana
Residing at DEER LODGE, MT
My commission expires JUNE 15 20 14

STATE OF IDAHO    )
                  :
COUNTY OF Ada    )

This instrument was acknowledged before me on this _____21st_____ day of May,
2012, by Vicki Jones.

*B L Wilfong*
(Signature of Notary Public)
Print Name: Brad Wilfong
Notary Public for the State of Idaho
Residing at 5312 Chinden Blvd. Boise, ID 83714
My commission expires 4-27-2015 20 15

BRAD WILFONG
Notary Public
State of Idaho

Date: 06/17/2020
Time: 14:39:52

## POWELL COUNTY, TREASURER

### Tax Year: 2018 Parcel# : 0000410200

Oper: public

---

### *OWNERSHIP INFORMATION*

| | | | | |
|---|---|---|---|---|
| Name: | JONES GORDON & | | Type: | 1   Primary |
| Alpha: | JONES GORDON & | | Mail To: | Yes |
| Address: | 8840 W RIVER BEACH LN | | | |
| City: | BOISE | ST:   ID | Zip:   83714 1811 | |

| | | | | |
|---|---|---|---|---|
| Name: | JONES VICKI | | Type: | 2   Legal |
| Alpha: | JONES VICKI | | Mail To: | No |
| Address: | | | | |
| City: | | ST: | Zip:   0000 | |

---

### *LEGAL DESCRIPTION*

| Legal#: | 1 | GEO Code: | 28-2209-15-3-01-01-0000 | Levy Dist: | 0717   HELMVILLE |
|---|---|---|---|---|---|

Desc Type:   T

Township:   13 N    Range:   10 W              Section:   15

Situs Address:  1192 WILSON CREEK RD
Situs City:   HELMVILLE    ST:   MT    Zip:   59843

Full Desc:   S15, T13 N, R10 W, ACRES 120, GROUSE PLACER, IN S2SW4SW4, SE4SW4 & MAGPIE PLACER, IN SW4NW4SE4, SW4SE4, NW4SE4SE4

Short Desc:   S15, T13 N, R10 W, ACRES 120, GROUSE PLACER, IN S2SW4SW4, SE4SW4 & MAGPIE PLACER, IN SW4NW4SE4, SW4SE4, NW4SE4SE4

---

| Legal#: | 2 | GEO Code: | 28-2209-16-4-02-01-0000 | Levy Dist: | 0717   HELMVILLE |
|---|---|---|---|---|---|

Desc Type:   T

Township:   13 N    Range:   10 W              Section:   16

Full Desc:   S16, T13 N, R10 W, ACRES 50, BLUEBIRD PLACER, IN N2SW4SE4, S2SE4SE4, SE4SW4SE4

Short Desc:   S16, T13 N, R10 W, ACRES 50, BLUEBIRD PLACER, IN N2SW4SE4, S2SE4SE4, SE4SW4SE4

---

| Legal#: | 3 | GEO Code: | 28-2209-22-2-01-01-0000 | Levy Dist: | 0717   HELMVILLE |
|---|---|---|---|---|---|

Desc Type:   T

Township:   13 N    Range:   10 W              Section:   22

Full Desc:   S22, T13 N, R10 W, ACRES 170, MEADOW LARK PLACER, IN NW4NE4 AND BLACKBIRD PLACER, IN N2NW4, N2SW4NW4, W2SE4NW4, SE4SW4NW4

Short Desc:   S22, T13 N, R10 W, ACRES 170, MEADOW LARK PLACER, IN NW4NE4 AND BLACKBIRD PLACER, IN N2NW4, N2SW4NW4, W2SE4NW4, SE4SW4NW4

---

### *BILLING HISTORY (RANGE FROM 2019 TO 2019)*

| Tax Year | Stmt# | Misc Code | Levy Dist | Sub | Description | 1st HALF Billed | Stat | Due Date | 2nd HALF Billed | Stat | Due Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 3424 | 0000 | 0717 | | HELMVILLE | 110.32 | DUE | 11/30/2019 | 110.31 | DUE | 05/31/2020 |
| 2019 | 3424 | FRST | 0717 | | FORESTER | 69.05 | DUE | 11/30/2019 | 69.05 | DUE | 05/31/2020 |
| 2019 | 3424 | PRDD | 0717 | | POWELL RURAL DISPOSAL | 90.00 | DUE | 11/30/2019 | 90.00 | DUE | 05/31/2020 |
| 2019 | 3424 | S&W | 0717 | | SOIL & WATER | 0.22 | DUE | 11/30/2019 | 0.22 | DUE | 05/31/2020 |
| | | | | | TOTAL: | 269.59 | | | 269.58 | | |

---

*Tyler Technologies Tax-Wise County Taxation Software*

# Property Record Card

## Summary

Primary Information

**Property Category:** RP
**Geocode:** 28-2209-15-3-01-01-0000
**Primary Owner:**
OMM DEVELOPMENT COMPANY LLC
8840 W RIVER BEACH LN
BOISE, ID 83714-1811
*NOTE: See the Owner tab for all owner information*

**Subcategory:** Agricultural and Timber Properties
**Assessment Code:** 0000410200
**PropertyAddress:** 1192 WILSON CREEK RD
HELMVILLE, MT 59843
**COS Parcel:**

**Certificate of Survey:**
**Subdivision:**
**Legal Description:**

S15, T13 N, R10 W, ACRES 120, GROUSE PLACER, IN S2SW4SW4, SE4SW4 & MAGPIE PLACER, IN SW4NW4SE4, SW4SE4, NW4SE4SE4

**Last Modified:** 12/20/2019 2:04:06 PM

General Property Information

**Neighborhood:** 228.001
**Living Units:** 0
**Zoning:**
**Linked Property:**

**Property Type:** FARM_R - Farmstead - Rural
**Levy District:** 28-0717-0717
**Ownership %:** 100

No linked properties exist for this property

**Exemptions:**

No exemptions exist for this property

**Condo Ownership:**
**General:** 0                    **Limited:** 0

Property Factors

**Topography:** 8
**Utilities:** 0
**Access:** 5, 6
**Location:** 0 - Rural Land

**Fronting:** 0 - None
**Parking Type:**
**Parking Quantity:**
**Parking Proximity:**

Land Summary

| Land Type | Acres | Value |
|---|---|---|
| Grazing | 0.000 | 00.00 |
| Fallow | 0.000 | 00.00 |
| Irrigated | 0.000 | 00.00 |
| Continuous Crop | 0.000 | 00.00 |
| Wild Hay | 0.000 | 00.00 |
| Farmsite | 0.000 | 00.00 |
| ROW | 0.000 | 00.00 |
| NonQual Land | 0.000 | 00.00 |
| Total Ag Land | 0.000 | 00.00 |
| Total Forest Land | 120.000 | 38,135.00 |
| Total Market Land | 0.000 | 00.00 |

Deed Information:

| Deed Date | Book | Page | Recorded Date | Document Number | Document Type |
|---|---|---|---|---|---|
| 5/21/2012 | R132 | C541 | 3/14/2017 | 175125 | Warranty Deed |
| 10/29/2008 | 119 | 383 | 12/3/2008 | 162934 | Notice of Purchaser's Interest |

| | | | | | |
|---|---|---|---|---|---|
| 10/28/2008 | 130 | 599 | 12/14/2015 | 173552 | Warranty Deed |
| 11/1/2007 | C117 | 00182 | | | |
| 2/9/2004 | Q109 | 00283 | | | |
| 2/9/2004 | Q109 | 00285 | | | |
| 8/29/1991 | QC87 | 00516 | | | |
| 2/7/1991 | WD86 | 00442 | | | |

## Owners

Party #1

| | |
|---|---|
| Default Information: | OMM DEVELOPMENT COMPANY LLC |
| | 8840 W RIVER BEACH LN |
| Ownership %: | 100 |
| Primary Owner: | "Yes" |
| Interest Type: | Fee Simple |
| Last Modified: | 10/9/2018 11:34:16 AM |

Other Names                                             Other Addresses

| Name | Type |
|---|---|

## Appraisals

Appraisal History

| Tax Year | Land Value | Building Value | Total Value | Method |
|---|---|---|---|---|
| 2020 | 38135 | 820 | 38955 | COST |
| 2019 | 38135 | 820 | 38955 | COST |
| 2018 | 38135 | 740 | 38875 | COST |

## Market Land

Market Land Info
No market land info exists for this parcel

## Dwellings

Existing Dwellings
No dwellings exist for this parcel

## Other Buildings/Improvements

Outbuilding/Yard Improvement #1

| | | |
|---|---|---|
| **Type:** Residential | **Description:** RRS1 - Shed, Frame | |
| **Quantity:** 1 | **Year Built:** 1915 | **Grade:** A |
| **Condition:** | **Functional:** | **Class Code:** 3301 |

Dimensions

| | | |
|---|---|---|
| **Width/Diameter:** 14 | **Length:** 21 | **Size/Area:** |
| **Height:** | **Bushels:** | **Circumference:** |

Outbuilding/Yard Improvement #2

| | | |
|---|---|---|
| **Type:** Residential | **Description:** RRS1 - Shed, Frame | |
| **Quantity:** 1 | **Year Built:** 1915 | **Grade:** A |
| **Condition:** | **Functional:** | **Class Code:** 3301 |

Dimensions

| | | |
|---|---|---|
| **Width/Diameter:** 10 | **Length:** 12 | **Size/Area:** |

Height:                    Bushels:                    Circumference:

## Commercial

Existing Commercial Buildings
No commercial buildings exist for this parcel

## Ag/Forest Land

Ag/Forest Land Item #1
**Acre Type:** Forest
**Class Code:** 1901
Productivity
**Quantity:** 171.02
**Units:** Board Feet/Acre
Valuation
**Acres:** 4.617
**Value:** 1338

**Irrigation Type:**
**Timber Zone:** 2

**Commodity:** Timber

**Per Acre Value:** 289.88

Ag/Forest Land Item #2
**Acre Type:** Forest
**Class Code:** 1901
Productivity
**Quantity:** 186.88
**Units:** Board Feet/Acre
Valuation
**Acres:** 98.248
**Value:** 32201

**Irrigation Type:**
**Timber Zone:** 2

**Commodity:** Timber

**Per Acre Value:** 327.75

Ag/Forest Land Item #3
**Acre Type:** Forest
**Class Code:** 1901
Productivity
**Quantity:** 159.81
**Units:** Board Feet/Acre
Valuation
**Acres:** 14.204
**Value:** 3737

**Irrigation Type:**
**Timber Zone:** 2

**Commodity:** Timber

**Per Acre Value:** 263.13

Ag/Forest Land Item #4
**Acre Type:** Forest
**Class Code:** 1901
Productivity
**Quantity:** 172.33
**Units:** Board Feet/Acre
Valuation
**Acres:** 2.931
**Value:** 859

**Irrigation Type:**
**Timber Zone:** 2

**Commodity:** Timber

**Per Acre Value:** 293.13



# Property Record Card

## Summary

Primary Information

Property Category: RP

Geocode: 28-2209-16-4-02-01-0000

Primary Owner:

OMM DEVELOPMENT COMPANY LLC

8840 W RIVER BEACH LN

BOISE, ID 83714-1811

*NOTE: See the Owner tab for all owner information*

Certificate of Survey:

Subdivision:

Legal Description:

S16, T13 N, R10 W, ACRES 50, BLUEBIRD PLACER, IN N2SW4SE4, S2SE4SE4, SE4SW4SE4

Last Modified: 12/20/2019 2:04:06 PM

Subcategory: Agricultural and Timber Properties

Assessment Code: 0000410200

PropertyAddress:

COS Parcel:

General Property Information

Neighborhood: 228.001

Living Units: 0

Zoning:

Linked Property:

Property Type: VAC_R - Vacant Land - Rural

Levy District: 28-0717-0717

Ownership %: 100

No linked properties exist for this property

Exemptions:

No exemptions exist for this property

Condo Ownership:

General: 0                      Limited: 0

Property Factors

Topography: 8

Utilities: 0

Access: 0

Location: 0 - Rural Land

Fronting: 0 - None

Parking Type:

Parking Quantity:

Parking Proximity:

Land Summary

| Land Type | Acres | Value |
|---|---|---|
| Grazing | 0.000 | 00.00 |
| Fallow | 0.000 | 00.00 |
| Irrigated | 0.000 | 00.00 |
| Continuous Crop | 0.000 | 00.00 |
| Wild Hay | 0.000 | 00.00 |
| Farmsite | 0.000 | 00.00 |
| ROW | 0.000 | 00.00 |
| NonQual Land | 0.000 | 00.00 |
| Total Ag Land | 0.000 | 00.00 |
| Total Forest Land | 50.000 | 13,503.00 |
| Total Market Land | 0.000 | 00.00 |

Deed Information:

| Deed Date | Book | Page | Recorded Date | Document Number | Document Type |
|---|---|---|---|---|---|
| 5/21/2012 | R132 | C541 | 3/14/2017 | 175125 | Warranty Deed |
| 10/29/2008 | 119 | 383 | 12/3/2008 | 162934 | Notice of Purchaser's Interest |

| 10/28/2008 | 130 | 599 | 12/14/2015 | 173552 | Warranty Deed |
| 11/1/2007 | C117 | 00182 | | | |
| 8/29/1991 | QC87 | 00516 | | | |
| 2/7/1991 | WD86 | 00442 | | | |

## Owners

Party #1

| | |
|---|---|
| Default Information: | OMM DEVELOPMENT COMPANY LLC |
| | 8840 W RIVER BEACH LN |
| Ownership %: | 100 |
| Primary Owner: | "Yes" |
| Interest Type: | Fee Simple |
| Last Modified: | 10/9/2018 11:34:16 AM |

Other Names                                              Other Addresses

Name                                    Type

## Appraisals

Appraisal History

| Tax Year | Land Value | Building Value | Total Value | Method |
|---|---|---|---|---|
| 2020 | 13503 | 0 | 13503 | COST |
| 2019 | 13503 | 0 | 13503 | COST |
| 2018 | 13503 | 0 | 13503 | COST |

## Market Land

Market Land Info
No market land info exists for this parcel

## Dwellings

Existing Dwellings
No dwellings exist for this parcel

## Other Buildings/Improvements

Outbuilding/Yard Improvements
No other buildings or yard improvements exist for this parcel

## Commercial

Existing Commercial Buildings
No commercial buildings exist for this parcel

## Ag/Forest Land

Ag/Forest Land Item #1

**Acre Type:** Forest
**Class Code:** 1901
Productivity
**Quantity:** 159.81
**Units:** Board Feet/Acre

**Irrigation Type:**
**Timber Zone:** 2

**Commodity:** Timber

Valuation

**Acres:** 16.91
**Value:** 4449

Per Acre Value: 263.13

Ag/Forest Land Item #2

**Acre Type:** Forest
**Class Code:** 1901
Productivity

**Irrigation Type:**
**Timber Zone:** 2

**Quantity:** 152.9
**Units:** Board Feet/Acre
Valuation

**Commodity:** Timber

**Acres:** 22.082
**Value:** 5446

Per Acre Value: 246.63

Ag/Forest Land Item #3

**Acre Type:** Forest
**Class Code:** 1901
Productivity

**Irrigation Type:**
**Timber Zone:** 2

**Quantity:** 186.88
**Units:** Board Feet/Acre
Valuation

**Commodity:** Timber

**Acres:** 11.008
**Value:** 3608

Per Acre Value: 327.75



# Property Record Card

## Summary

### Primary Information

**Property Category:** RP
**Geocode:** 28-2209-22-2-01-01-0000
**Primary Owner:**
OMM DEVELOPMENT COMPANY LLC
8840 W RIVER BEACH LN
BOISE, ID 83714-1811
*NOTE: See the Owner tab for all owner information*
**Certificate of Survey:**
**Subdivision:**

**Subcategory:** Agricultural and Timber Properties
**Assessment Code:** 0000410200
**PropertyAddress:**

**COS Parcel:**

**Legal Description:**
S22, T13 N, R10 W, ACRES 170, MEADOW LARK PLACER, IN NW4NE4 AND BLACKBIRD PLACER, IN N2NW4, N2SW4NW4, W2SE4NW4, SE4SW4NW4
**Last Modified:** 12/20/2019 2:04:06 PM

### General Property Information

**Neighborhood:** 228.001
**Living Units:** 0
**Zoning:**
**Linked Property:**

**Property Type:** VAC_R - Vacant Land - Rural
**Levy District:** 28-0717-0717
**Ownership %:** 100

No linked properties exist for this property

**Exemptions:**

No exemptions exist for this property

### Condo Ownership:

**General:** 0

**Limited:** 0

### Property Factors

**Topography:** 8
**Utilities:** 0
**Access:** 0
**Location:** 0 - Rural Land

**Fronting:** 0 - None
**Parking Type:**
**Parking Quantity:**
**Parking Proximity:**

### Land Summary

| Land Type | Acres | Value |
|---|---|---|
| Grazing | 0.000 | 00.00 |
| Fallow | 0.000 | 00.00 |
| Irrigated | 0.000 | 00.00 |
| Continuous Crop | 0.000 | 00.00 |
| Wild Hay | 0.000 | 00.00 |
| Farmsite | 0.000 | 00.00 |
| ROW | 0.000 | 00.00 |
| NonQual Land | 0.000 | 00.00 |
| Total Ag Land | 0.000 | 00.00 |
| Total Forest Land | 170.000 | 53,705.00 |
| Total Market Land | 0.000 | 00.00 |

### Deed Information:

| Deed Date | Book | Page | Recorded Date | Document Number | Document Type |
|---|---|---|---|---|---|
| 5/21/2012 | R132 | C541 | 3/14/2017 | 175125 | Warranty Deed |
| 10/29/2008 | 119 | 383 | 12/3/2008 | 162934 | Notice of Purchaser's Interest |

| | | | | | |
|---|---|---|---|---|---|
| 10/28/2008 | 130 | 259 | 12/14/2015 | 173552 | Warranty Deed |
| 11/1/2007 | C117 | 00182 | | | |
| 2/8/2004 | Q109 | 283-5 | | | |
| 8/29/1991 | QC87 | 00516 | | | |
| 2/7/1991 | WD86 | 00442 | | | |

## Owners

Party #1

| | |
|---|---|
| Default Information: | OMM DEVELOPMENT COMPANY LLC |
| | 8840 W RIVER BEACH LN |
| Ownership %: | 100 |
| Primary Owner: | "Yes" |
| Interest Type: | Fee Simple |
| Last Modified: | 10/9/2018 11:34:16 AM |

Other Names

| Name | Type | Other Addresses |
|---|---|---|

## Appraisals

Appraisal History

| Tax Year | Land Value | Building Value | Total Value | Method |
|---|---|---|---|---|
| 2020 | 53705 | 0 | 53705 | COST |
| 2019 | 53705 | 0 | 53705 | COST |
| 2018 | 53705 | 0 | 53705 | COST |

## Market Land

Market Land Info
No market land info exists for this parcel

## Dwellings

Existing Dwellings
No dwellings exist for this parcel

## Other Buildings/Improvements

Outbuilding/Yard Improvements
No other buildings or yard improvements exist for this parcel

## Commercial

Existing Commercial Buildings
No commercial buildings exist for this parcel

## Ag/Forest Land

Ag/Forest Land Item #1

**Acre Type:** Forest                                    **Irrigation Type:**

**Class Code:** 1901                                     **Timber Zone:** 2

Productivity

**Quantity:** 171.02                                     **Commodity:** Timber

Units: Board Feet/Acre
Valuation
**Acres:** 1.82
**Value:** 528

Per Acre Value: 289.88

Ag/Forest Land Item #2
**Acre Type:** Forest
**Class Code:** 1901
Productivity
**Quantity:** 186.88
**Units:** Board Feet/Acre
Valuation
**Acres:** 144.218
**Value:** 47267

Irrigation Type:
Timber Zone: 2

Commodity: Timber

Per Acre Value: 327.75

Ag/Forest Land Item #3
**Acre Type:** Forest
**Class Code:** 1901
Productivity
**Quantity:** 152.9
**Units:** Board Feet/Acre
Valuation
**Acres:** 23.962
**Value:** 5910

Irrigation Type:
Timber Zone: 2

Commodity: Timber

Per Acre Value: 246.63

